# Supreme Court of Florida

————————

No. SC11-1846

————————

**MARK ANTHONY POOLE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 26, 2014]


PER CURIAM.

Mark Anthony Poole was convicted of the murder of Noah Scott, attempted first-degree murder of Loretta White[1], armed burglary, sexual battery of Loretta White, and armed robbery. Poole v. State, 997 So. 2d 382, 387 (Fla. 2008). Following the penalty phase, the jury recommended that Poole be sentenced to death by a vote of twelve to zero, and the judge followed the jury's recommendation. Id. at 388. On direct appeal, based on the cumulative effect of

---

1. Although the female victim has changed her name since the direct appeal in this case, for consistency, we will refer to her by her previous surname, White, throughout this opinion.

the errors made during the penalty phase of the trial, this Court vacated Poole's

sentence of death and remanded the case for a new penalty phase. Id. at 394. On

remand, following the new penalty phase, the jury recommended death by a vote of

eleven to one, and the trial court followed the jury's recommendation. Poole now

appeals his resentencing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

For the reasons outlined below, this Court affirms the trial court's resentencing of

Poole to death.

## Facts and Procedural History

On the evening of October 12, 2001, after playing some video games in the bedroom of their mobile home, Noah Scott and Loretta White went to bed sometime between 11:30 p.m. and 12 a.m. Later during the night, White woke up with a pillow over her face and Poole sitting on top of her. Poole began to rape and sexually assault her as she begged Poole not to hurt her because she was pregnant. As White struggled and resisted, Poole repeatedly struck her with a tire iron. She put her hand up to protect her head, and one of her fingers and part of another finger were severed by the tire iron. While repeatedly striking White, Poole asked her where the money was. During this attack on White, Scott attempted to stop Poole, but was also repeatedly struck with the tire iron. As Scott struggled to defend White, Poole continued to strike Scott in the head until Scott died of blunt force head trauma. At some point after the attack, Poole left the bedroom and White was able to get off the bed and put on clothes but she passed out before leaving the bedroom. Poole came back in the bedroom and touched her vaginal area and said "thank you." White was in and out of consciousness for the rest of the night. She was next aware of the time around 8 a.m. and 8:30 a.m. when her alarm went off.

When her alarm went off, White retrieved her cell phone and called 911. Shortly thereafter, police officers were dispatched to the home. They found Scott unconscious in the bedroom and White

severely injured in the hallway by the bedroom. White suffered a concussion and multiple face and head wounds and was missing part of her fingers. Scott was pronounced dead at the scene. Evidence at the crime scene and in the surrounding area linked Poole to the crimes. Several witnesses told police officers that they saw Poole or a man matching Poole's description near the victims' trailer on the night of the crimes. Stanley Carter stated that when he went to the trailer park around 11:30 that night, he noticed a black male walking towards the victims' trailer. Carter's observations were consistent with that of Dawn Brisendine, who knew Poole and saw him walking towards the victims' trailer around 11:30 p.m. Pamela Johnson, Poole's live-in girlfriend, testified that on that evening, Poole left his house sometime in the evening and did not return until 4:50 a.m.

Poole was also identified as the person selling video game systems owned by Scott and stolen during the crime. Ventura Rico, who lived in the same trailer park as the victims, testified that on that night, while he was home with his cousin's girlfriend, Melissa Nixon, a black male came to his trailer and offered to sell him some video game systems. Rico agreed to buy them for $50, at which point the black male handed him a plastic trash bag. During this exchange, Nixon got a good look at the man and later identified Poole when the police showed her several photographs. Nixon testified that the next morning, when her son was going through the trash bag, he noticed that one of the systems had blood on it.

Pamela Johnson also testified that on the same morning, she found a game controller at the doorstep of Poole's house, she handed it to Poole, and Poole put it in his nightstand. She indicated that she had never seen that game controller before that morning and did not know what it would be used for because neither she nor Poole owned any video game systems. During the search of Poole's residence, the police retrieved this controller. In addition, the police retrieved a blue Tommy Hilfiger polo shirt and a pair of Poole's Van shoes, shoes Poole said he had been wearing on the night of the crimes. A DNA analysis confirmed that the blood found on the Sega Genesis box, Super Nintendo, Sega Dreamcast box and controller matched the DNA profile of Scott. Also, a stain found on the left sleeve of Poole's blue polo shirt matched White's blood type. The testing of a vaginal swab also confirmed that the semen in White was that of Poole. A

- 3 -

footwear examination revealed that one of the two footwear impressions found on a notebook in the victims' trailer matched Poole's left Van shoe. The tire iron used in the crimes was found underneath a motor home located near the victims' trailer. A DNA analysis determined that the blood found on this tire iron matched Scott's DNA profile.

Based on this evidence, the jury returned a verdict finding Poole guilty on all charges, including first-degree murder. Following the penalty phase, the jury recommended death by a vote of twelve to zero. The trial court followed the jury's recommendation and sentenced Poole to death. The trial court found two statutory aggravating circumstances: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person, and (2) the murder was especially heinous, atrocious, or cruel. The court also found three statutory mitigators and numerous nonstatutory mitigators. The statutory mitigators were: (1) the crime for which Poole was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance (moderate weight); (2) Poole's capacity to conform his conduct to the requirements of law was substantially impaired (moderate weight); and (3) Poole had no significant history of prior criminal activity (little weight). The nonstatutory mitigators were: (1) Poole is of borderline intelligence (some weight); (2) Poole received a head injury, which created dementia (little weight); (3) Poole's age at the time of the crime linked with mental deficiency and lack of serious criminal history (moderate weight); (4) Poole dropped out of school due to his low intelligence and learning disabilities (little weight); (5) Poole lost Mr. Bryant, his "best friend, father figure, employer," and that had an emotional effect on Poole and led to his drug use (some weight); (6) Poole sought help for his drug problem in the past (little weight); (7) Poole had an alcohol abuse problem at the time of the crime (little weight); (8) Poole had a drug abuse problem at the time of the crime (little weight); (9) Poole does not have antisocial personality disorder nor is he psychopathic (some weight); (10) Poole has and can continue a relationship with his son (minimum weight); (11) Poole has a strong work ethic (little weight); (12) Poole has a close relationship with his family (moderate weight); (13) Poole is a religious person (little weight); and (14) the murder and rape were impulsive excessive acts, not premeditated acts (little weight). The

trial court determined that these mitigating factors did not outweigh the aggravating circumstances and, as a result, the trial court sentenced Poole to death on the count of first-degree murder. The trial court also sentenced Poole to consecutive life sentences for the attempted first-degree murder of Loretta White, armed burglary, sexual battery of Loretta White, and armed robbery.

[On direct] appeal, Poole raise[d] four issues: (1) whether the trial court abused its discretion in denying Poole's motion for mistrial when the prosecutor repeatedly commented during closing argument on Poole's failure to testify at trial and on his silence after his arrest; (2) whether the prosecutor violated Poole's right to a fair penalty phase proceeding by cross-examining defense witnesses about the unproven prior arrests, the unproven content of a tattoo, and the lack of remorse; (3) whether the prosecutor violated Poole's right to a fair penalty phase proceeding by misleading the jurors about their responsibilities in recommending a sentence; and (4) whether Florida's death penalty statute violates the Sixth Amendment right to trial by jury.

Id. at 387-89 (footnote omitted). Based on the cumulative effect of the errors made during the penalty phase of the trial, this Court vacated Poole's death sentence and remanded the case for a new penalty phase. Id. at 394.

**Resentencing**

On remand, following the new penalty phase, the jury recommended death by a vote of eleven to one. Following a Spencer[2] hearing, the trial court followed the jury's recommendation and sentenced Poole to death. The trial court found four aggravating circumstances: (1) the contemporaneous conviction for the attempted murder of Loretta White (very great weight); (2) capital felony occurred

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 5 -

during the commission of burglary, robbery and sexual battery (great weight); (3) capital felony was committed for financial gain (merged with robbery, but not merged with burglary or sexual battery) (less than moderate weight); and (4) the capital felony was committed in a heinous, atrocious or cruel manner (HAC) (very great weight).

The trial court found two statutory mental mitigating circumstances: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (moderate to great weight); and (2) defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (great weight).

The trial court also found eleven nonstatutory mitigating circumstances, according them little or very little weight: (1) borderline intelligence (little weight); (2) defendant dropped out of school (very little weight); (3) loss of father figure had emotional effect and led to his drug abuse (very little weight); (4) defendant sought help for drug problem (very little weight); (5) defendant had an alcohol problem at time of crime (very little weight); (6) drug abuse problem at time of crime (very little weight); (7) defendant has a relationship with son (very little weight); (8) strong work ethic (very little weight); (9) defendant is a religious person (very little weight); (10) dedicated uncle (very little weight); and (11) defendant needs treatment for mental disorder unrelated to substance abuse (very

little weight).  The trial court determined that the proposed mitigator that the defendant has severe chronic alcohol and cocaine problem for which he needs treatment was not proven.

The trial court sentenced Poole to death, finding that the aggravating circumstances "far outweigh the mitigating circumstances" and that the "heinous, atrocious, or cruel aggravator alone outweighs all the mitigating circumstances in this case."  Poole now raises several claims related to his resentencing, all of which are addressed below.

## PEREMPTORY STRIKES

Poole claims that the State's race-neutral explanation for striking venirepersons Wearing and Blandin, both African Americans, was actually a pretext for discrimination.  The defense repeatedly attacked the genuineness of the State's race-neutral explanations for striking these two jurors.  The defense also argued that the State engaged in disparate questioning as to these two jurors.

### Deference to Trial Courts

This Court has consistently held that trial courts have broad discretion in determining the propriety of the exercise of a peremptory challenge.  See Franqui v. State, 699 So. 2d 1332, 1334-35 (Fla. 1997); Curtis v. State, 685 So. 2d 1234 (Fla. 1996).  "Trial judge[s are] necessarily []vested with broad discretion in determining whether peremptory challenges are racially intended.  Only one who is

present at the trial can discern the nuances of the spoken word and the demeanor of those involved." Reed v. State, 560 So. 2d 203, 206 (Fla. 1990) (citation omitted); see also Files v. State, 613 So. 2d 1301, 1305 (Fla. 1992) (noting that this Court "must rely on the superior vantage point of the trial judge, who is present, can consider the demeanor of those involved, and can get a feel for what is going on in the jury selection process.").

A trial court's decision to allow a peremptory strike of a juror is based primarily on an assessment of credibility. King v. State, 89 So. 3d 209, 229 (Fla. 2012) (citing Melbourne v. State, 679 So. 2d 759, 764 (Fla. 1996)), cert. denied, 133 S. Ct. 478 (2012). As a reviewing court, this Court must "acknowledge that peremptory challenges are presumed to be exercised in a nondiscriminatory manner." Nowell v. State, 998 So. 2d 597, 602 (Fla. 2008). On appeal, the appropriate standard to determine the likelihood that a peremptory challenge was used discriminatorily is abuse of discretion. Id. As the trial court is generally in the best position to assess the genuineness of the reason advanced, the decision will be affirmed unless clearly erroneous. Id. Although appellate courts need to defer to a trial court's credibility assessment, this Court has recognized that this deference does not require this Court to "rubber-stamp" a trial court's ruling, which is not supported by the record. See Hayes v. State, 94 So. 3d 452, 462 (Fla. 2012); Nowell, 998 So. 2d at 602.

**Genuineness of the State's Race-Neutral Explanation**

Discriminatory exercise of peremptory challenges based on race or ethnicity violates a defendant's rights to equal protection and to be tried by an impartial jury under the United States and state constitutions.  See, e.g., Batson v. Kentucky, 476 U.S. 79, 86-7 (1986).  In Melbourne, 679 So. 2d at 763, this Court recognized that the three-step guideline for resolving an allegation of discrimination in peremptory challenges which was set out in State v. Neil, 457 So. 2d 481, 486-87 (Fla. 1984), has been simplified in subsequent cases.  This Court explained the considerations at each step in the process:

> A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike.  If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
>
> At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral, and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3) . . . Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination.

Melbourne, 679 So. 2d at 764 (footnotes omitted).  In deciding whether the proffered race-neutral reason for the peremptory strike is a pretext, the Court should focus on the genuineness of the explanation, not the reasonableness.  Id.

- 9 -

Reasonableness is one factor to be considered in assessing the genuineness of the explanation. Id. at n.6. In making a genuineness determination, the Court should consider all relevant circumstances surrounding the strike, which may include, but are not limited to "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." Nowell, 998 So. 2d at 602 (quoting Melbourne, 679 So. 2d at 764 n.8); Murray v. State, 3 So. 3d 1108, 1119 (Fla. 2009). In order to determine whether a trial court's decision to allow a peremptory strike of a juror was clearly erroneous, this Court must review the proffered race-neutral explanations offered by the State and the circumstances in which they were made. Nowell, 998 So. 2d at 604 (Fla. 2008).

The trial court must make an indication on the record that it not only accepted the race-neutral explanation, but actually engaged in a "genuineness" analysis. Hayes, 94 So. 3d at 463-64. Although there is no script for the trial judge to recite, to properly comply with Step 3 of Melbourne, a trial court must weigh the genuineness of a proffered race-neutral explanation just as it would any other disputed fact. Id. at 463. As the trial court proceeds to evaluate the genuineness of the proffered reason, it can "inquire of the opponent of the strike, who at that point bears the burden of persuasion, to demonstrate why the reason was not genuine." Id.

# This Case

During voir dire, the prosecutor questioned venirepersons Wearing and Blandin about their feelings regarding the death penalty:

> **PROSECUTOR**: Okay. Ms. Wearing, how do you feel about this idea, just philosophically, that we put people to death as punishment for a crime?
> **JUROR WEARING**: I'm kind of like - - like a little mixed feeling, but at the same time, if the punishment fits the crime then, yeah, go ahead and do - - do away and put him to death. But if not, then like, you know, why take a life for a life? So it's - - I'm just kind of in between.
> **PROSECUTOR**: How old are you?
> **JUROR WEARING**: 21.
> **PROSECUTOR**: How do you feel about being asked to do this job when you're barely old enough to vote?
> **JUROR WEARING**: I'm kind of nervous, but at the same time, really confident that I can handle it.
> **PROSECUTOR**: If you were to be the person that went to the polls tomorrow and said we keep the death penalty in Florida or we just do away with it, people that get found guilty of murder just get life in prison, would you keep the death penalty or do away with it?
> **JUROR WEARING**: I'm not sure. It's - -
> **PROSECUTOR**: That's a fair enough answer. It doesn't have to be a yes-or-no answer. I'm not sure is a perfectly good answer. I mean we're asking very weighty questions here. Believe me, I understand what I'm asking. Mr. Blandin?
> **JUROR BLANDIN**: Yes, sir.
> **PROSECUTOR**: How do you feel about this idea philosophically that we say it's okay to put people to death as punishment in Florida?
> **JUROR BLANDIN**: I'm like the rest of these guys. If it fits the crime they committed and - - but at the same time, I'm like, if I had to vote - - kind of like her, I don't - - I don't really know what I would vote for.

Immediately prior to the prosecution's strike of Juror Wearing, both the State and the Defense accepted Juror Maruska. The State simultaneously sought to strike both Venirepersons Wearing and Blandin based on the fact that they both answered that they were "not sure" to his question regarding how they would vote if they had the opportunity to keep or abolish the death penalty in Florida:

> **PROSECUTOR**: . . . But I asked them if you had to go into the voting booth and vote, how would you vote?
> And I wrote it down verbatim. Ms. Wearing said: I'm not sure. And Mr. Blandin said: Not sure how I would vote.

The defense objected on the grounds that the question was not relevant to the case at hand, and instead sought to determine the jurors' political views on the death penalty.

The trial judge then asked the prosecutor, "Do you have any other race-neutral reason besides that?" The prosecutor responded:

> **PROSECUTOR**: No I don't. . . . And I believe that they're weak death penalty jurors based on that answer. . . .There's a lot of ways to figure out if people are weak death penalty jurors. That was one of them for me.
> . . . .
> **PROSECUTOR**: I can tell you that no one else on this panel answered that question that way. In fact, Ms. Ippert, who is also an African-American juror, said very clearly she would vote for the death penalty. That is, she would vote to keep the death penalty as an option.
> **THE COURT**: Well, we're going to get to her, so let's see what happens. I'll for the time being, I'm going to accept those, and I'll get back to you.

The trial court determined that a juror's political view on an issue is a sufficient race-neutral reason to strike a venireperson. Shortly after the striking of venirepersons Wearing and Blandin, the State decided to backstrike Juror Maruska, stating that he is "also weak on the death penalty and young and white."

In an effort to clarify the record, the Court explained that the fact that the prosecution "kept Ms. Ippert, who answered that she would vote for it, and she is an African-American . . ." supported the prosecution's proffered race-neutral explanation. In closing, the trial judge commented that he assumed that venirepersons Wearing and Blandin were being struck because they were too young to be on the panel. The judge also implied that he assumed this was also the State's reason for striking Staresnick, a young white venireperson. At this point, the prosecutor interjected with the following statement:

> Well, and I did say, when I struck Juror Maruska, that Staresnick, Maruska, and the two African-Americans who I had the race - - other race-neutral reason for, were all too young. They're all in their early twenties.

The prosecution had not previously offered age as a reason for the striking of Venirepersons Wearing and Blandin. At the time of the strikes, the only race-neutral explanation he provided was that they had seemed like weak death penalty jurors based on their answers to his voting question. The trial judge accepted his striking of these jurors based on this race-neutral explanation.

- 13 -

The next day, the prosecution revisited the striking of Venirepersons Wearing and Blandin, stating for the record that there was case law to support age as a race-neutral reason for a peremptory strike. The State mentioned that Wearing, Blandin, Staresnick and Maruska were all young and that none of them had any children. The State continued with the ages of the venirepersons who were not struck, many in their fifties and sixties and many who had children. The defense objected to the striking of Venirepersons Wearing and Blandin based on this supplemental reason, arguing that the case law pertained to the maturity, not the age, of the potential jurors, and that the jurors were not asked questions regarding their maturity. The trial court did not make a contemporaneous finding regarding this additional race-neutral explanation, simply stating, "Okay. All right. Well, you both made your record."

Because the trial court followed the procedure outlined in <u>Melbourne</u>, and its findings regarding the genuineness of the State's reason for striking venirepersons Wearing and Blandin were supported by the record, its decision to allow the strikes was not clearly erroneous. The defense requested that this Court determine that the State's explanation is not genuine based on the State's supplementing of the record the next morning to add the race-neutral explanation that the stricken jurors were young and had no children. In considering the trial court's "genuineness" finding, it is important to note that the trial court's acceptance of the State's race-neutral

reason took place prior to the prosecution's supplementing of the record the next day. In determining that the trial court's determination was not clearly erroneous, we rely on the trial court's acceptance of the State's race-neutral reason offered immediately at the time of the defense's objection; this is different from the State's belated reliance on age and lack of children as the reason for the strike, which could be considered less genuine. See Nowell, 998 So. 2d at 606; Franqui, 699 So. 2d at 1335.

The strikes allowed in this case are unlike those in Nowell, where this Court found that the trial court's decision to allow the peremptory challenge to the challenged juror was clearly erroneous because the State's explanations, which may have appeared to be race neutral, were pretextual. 998 So. 2d at 606. In Nowell, the State sought to exercise a peremptory strike against Mr. Ortega, a venireperson described as having a Hispanic background. Id. at 602. The defense objected to the strike. Id. When prompted to provide a race neutral reason for the strike, the prosecutor initially stated that his reasons for the strike were twofold: (1) Mr. Ortega appeared to be of similar age to the defendant and would probably relate to him based on age; and (2) Mr. Ortega's wife worked at a childcare nurturing facility, and "based on philosophies within the family," he may not be able to apply the law. Id. at 603. After the trial judge asked the prosecutor to identify specific answers given by Mr. Ortega that would provide bases for the two

supposed race-neutral peremptory challenges, the prosecutor stated that "[t]here [are] no specific answers," and went on to state a third reason for the strike: "[I]n spite of the fact that he said he could follow the law . . . I don't think he is going to be the kind of juror that I would like." Id. (emphasis omitted).

In addition to defense counsel's observation that Mr. Ortega possessed qualities that the State of Florida usually sought in jurors, such as stable employment and a sibling in law enforcement, this Court found that Mr. Ortega possessed strikingly similar qualities to a white juror, Mr. Collins, who was not challenged by the State. Id. at 603, 605. Both jurors were approximately the same age, were fathers, and both stated that they believed the death penalty should be reserved for the most serious crimes. Id. at 605, 606 n.7. Additionally, the victim in Nowell was also in her mid-twenties, which further undermined the genuineness of the State's asserted justification that Mr. Ortega would likely identify with the defendant—he was just as likely to identify with the victim, which would clearly favor the State's position. Id. at 605. This Court also found it persuasive that the prosecutor could not identify behavior in the record to demonstrate why he did not like Mr. Ortega, nor could the prosecutor identify statements in the record to support its assertion that Mr. Ortega would not follow the law, but instead acknowledged that Mr. Ortega stated that he would follow the law. Id. at 604-06.

- 16 -

In the case at hand, most notably, of the venirepersons who were asked the question regarding how they would vote if they had the option, Wearing and Blandin were the only two to state that they were "not sure." Other jurors answered in a manner that implied that, more likely than not, they would vote to keep the death penalty as an option, as opposed to the blatant ambivalence expressed by the two challenged venirepersons. Although it appears that Juror Ippert was the only African-American member of the seated jury, it does not appear likely that the peremptory strikes were used to discriminate against venirepersons Wearing and Blandin based on race. Further, upon review of the record and based on the totality of the circumstances, the prosecutor's stated reasons for the strikes of Wearing and Blandin do not appear to be pretextual. The trial court did not abuse its discretion in allowing the strikes.

### Disparate Questioning

Poole also argues that there was disparate questioning of venirepersons Wearing and Blandin. Although it is true that "disparate treatment of similarly situated jurors can give rise to a finding of pretext," the record does not indicate that the defense raised the issue of disparate questioning to the trial court. See Hayes, 94 So. 3d at 467 (citing Melbourne, 679 So. 2d at 764 n.8). "Had the [defense] done so, the trial judge would have been able to pursue this inquiry and demand a response from the [State] relating to the suggestion of pretext." Id.; see

also <u>King</u>, 89 So. 3d at 230 (citing <u>Davis v. State</u>, 691 So. 2d 1180, 1181 (Fla. 3d DCA 1997) (holding that a challenge to a peremptory strike based on disparate treatment must be raised before the trial court or it is waived.).

At trial, the defense did not state explicitly or imply that it wanted to allege disparate questioning on behalf of the prosecutor; the defense based its objection on venirepersons Wearing's and Blandin's race, and not the prosecution's questioning of them. In defending his explanation that venirepersons Wearing and Blandin should be excused based on their answers to the voting question, the prosecutor acknowledged that he did not ask everyone the question. However, the defense now argues that venireperson Wearing's responses to the prosecutor's questions were not very different from those given by a white juror, Ms. Westcott. This argument was not raised before the trial court, and is therefore, waived. Additionally, the record does not indicate that the prosecutor questioned the venire in a discriminatory manner.

## ADMISSIBILITY OF SEVERED FINGERTIP

Poole next argues that the trial court abused its discretion in allowing the State to introduce the severed fingertip of victim Loretta White, preserved in a jar of formalin, into the new penalty phase. The defense claims that the probative value of the evidence was substantially outweighed by the prejudicial value of the severed fingertip, especially considering that the prosecutor offered no credible

reason as to why the severed fingertip was relevant to any issue in the penalty phase, much less any issue in dispute.

This Court recognizes the broad discretion granted to trial courts in determining the relevance of evidence; such a determination will not be disturbed absent an abuse of discretion. See Heath v. State, 648 So. 2d 660, 664 (Fla. 1994). However, relevant evidence is not automatically admissible. This Court has explained the standard for trial courts to determine when relevant evidence is admissible:

> [A]ny fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion." Section 90.403, Florida Statutes (2007), provides that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." However, it has been observed that "[m]ost evidence that is admitted will be prejudicial or damaging to the party against whom it is offered." The question under the statute is not prejudice, but instead, unfair prejudice.

King, 89 So. 3d at 227 (citations omitted). Thus, the trial judge must first determine that the evidence is relevant for a specific purpose—it's probative value; next, the trial judge must weigh the importance of the evidence to the specific purpose, against the possibility that the evidence will unfairly prejudice the party it is offered against, confuse or mislead the jury or needlessly present evidence that will already be presented to the jury. See Sexton v. State, 697 So. 2d 833, 837 (Fla. 1997).

- 19 -

When the State sought to admit the preserved fingertip into evidence, defense counsel objected on the ground that it was inflammatory and that any probative value would be far outweighed by its unfair prejudice. The defense also objected to the admission of Ms. White's natural fingernails with her skin attached. The trial court overruled the objections, stating particularly that the preserved fingertip was "really not . . . difficult to look at. It's not unpleasant. There's not blood on it. It just shows what appears to be a large chunk of skin and the end of a finger."

We find that the trial court did not abuse its discretion in admitting the preserved fingertip. The fingertip was relevant because it was severed during the same criminal episode at issue in this penalty phase. Also the preserved fingertip was relevant to the amount of force used during the attempted first degree murder of Ms. White, which was offered as an aggravator in this case. Additionally, we find that any error in admitting the severed fingertip would be harmless. See State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986).

## PROSECUTORIAL MISCONDUCT

Poole acknowledges that the arguments made in support of his allegation of prosecutorial misconduct are largely unpreserved. The defense, however, argues that the misconduct of the prosecutor was so severe that it resulted in fundamental

error, requiring this Court to grant relief in the absence of the generally required contemporaneous objection. See Brooks v. State, 762 So. 2d 879, 899 (Fla. 2000).

Fundamental error has been defined as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Id. (citations omitted). It has also been described as error that is so significant that the sentence of death "could not have been obtained without the assistance of the alleged error." Snelgrove v. State, 107 So. 3d 242, 257 (Fla. 2012) (quoting Simpson v. State, 3 So. 3d 1135, 1146 (Fla. 2009)). If this Court finds a comment to be improper, factors to be weighed in determining whether an improper comment rises to the level of fundamental error include whether the statement was repeated and whether the jury was provided with an accurate statement of the law after the improper comment was made. See Poole, 997 So. 2d at 395 (Fla. 2008).

Of all the comments that the defense claims were improper, the only comment that was objected to during the trial is the prosecutor's reference in closing argument to the testimony of the defendant's family offered in mitigation that the defendant had multiple head injuries. However, the trial court gave the jury a curative instruction following that comment. Therefore, the defense is required to demonstrate fundamental error to prevail on each prosecutorial misconduct claim. We address each comment individually below.

## Prosecutor's "All That Crap" Comment

The prosecutor's reference to the testimony of Poole's family members as "all that crap" during closing argument does not rise to the level of fundamental error, as demonstrated by this Court's decision in <u>Mendoza v. State</u>, 964 So. 2d 121 (Fla. 2007). In <u>Mendoza</u>, the prosecutor made comments during closing arguments at the penalty phase which indicated that the defendant's mitigating evidence was an excuse and that testimony of one of the experts was "garbage." <u>Id.</u> at 133. This Court determined that the prosecutor's comments "were not so egregious or so continuous as to constitute the same type of fundamental error that we have found in other cases." <u>Id.</u>

When the prosecutor referred to Poole's family's testimony as "all that crap," the trial judge informed the jury that the comment was improper and instructed them to disregard it. Further, the prosecutor explained to the jury that he was not attempting to tell them not to consider the evidence presented by Poole's family, but was instead requesting that the jury give more weight to the doctors' evidence regarding the defendant's head injuries. Under these circumstances, this comment does not rise to the level of fundamental error.

## Prosecutor's "False Apology"

The trial judge granted the defense a curative instruction after sustaining its objection to the prosecutor's "all that crap" comment. In apologizing to the jury

for this comment, the prosecutor stated that he gets "wound up when [he] talk[s] about murders, especially heinous, atrocious, or cruel murders." The defense now argues that this "false apology" constitutes fundamental error. This isolated comment does not rise to the level of fundamental error. See Braddy v. State, 111 So. 3d 810, 848 (Fla. 2012).

**Prosecutor's Mischaracterization of Intoxication Evidence**

The defendant argues that the prosecutor sought to mislead the jury to believe that even if they found Dr. Kremper to be credible and even if they believed that the defense had proved the impaired capacity mitigating factor, they could give it no weight simply because Mr. Poole voluntarily drank and did drugs. The defense also argues that the prosecutor mischaracterized psychological testimony by stating that Poole's impaired capacity was only due to his voluntary intoxication, where the expert testified that it was also due to Poole's low intelligence.

A prosecutor may request the jury to accord minimal weight to a mitigator that the defendant has proven. The cases cited by the defense, Mahn v. State, 714 So. 2d 391, 401 (Fla. 1998) and Nibert v. State, 574 So. 2d 1059, 1063 (Fla. 1990), stand for the proposition that if the greater weight of the testimony supports a mitigator, the trial court must consider that mitigator to be proven; this is a separate question from how much weight should be assigned to each mitigator, once

proven.  See Trease v. State, 768 So. 2d 1050, 1055 (Fla. 2000) (citing Hitchcock

v. Dugger, 481 U.S. 393, 394 (1987) and Lockett v. Ohio, 438 U.S. 586, 604

(1978) (A sentencing judge or jury must consider all mitigation offered by the

defendant to avoid the death penalty; nevertheless, the sentencer is allowed to

accord the mitigating factor no weight.)).

The prosecutor in this case urged the jury members to use their individual

perceptions in deciding who to believe, stating "The judge will tell you that you

rely on your own conclusions about a witness.  You can believe or disbelieve all or

any part of what a witness says, and that includes experts."  The prosecutor

continued, "I submit to you that when you think about that evidence, you need to

really think about whether that is a mitigating circumstance, whether it mitigates

the penalty that you should vote to impose, or whether that goes to sympathy that

you're not allowed to consider."

After discussing the possible aggravators in the case and how weight should

be assigned, the prosecutor discussed how to assign weight to mitigators:

> The first two of these mitigators really rely on the testimony of these
> two doctors.  They are that the capital felony was committed while the
> defendant was under the influence of extreme mental or emotional
> disturbance . . . if you are reasonably convinced that they proved it to
> you, then you should consider it.
> But here's the rub: You don't have to accept it as mitigating the death
> penalty at all.  And I'm going to tell you why you shouldn't.  Because
> both of these doctors said that the only reason Mr. Scott [sic] hit this
> mitigator and the next one . . . was because he voluntarily drank and
> did drugs.  The only reason they told you.

The prosecutor does not refute that the mental mitigators were proven, rather the prosecutor implies that perhaps the jury should give the mental mitigation a small amount of weight because the defendant may have been the cause of his own emotional distress and substantially impaired capacity. This was not improper.

Similarly, on direct appeal, this Court determined that it was not improper for this same prosecutor to tell the jury that it is allowed to reject brain damage if it finds that brain damage does not mitigate the death penalty. Poole, 997 So. 2d at 396. Additionally, any error that the prosecutor made in telling the jury that voluntary intoxication was the only reason that the experts gave to support Poole's impaired capacity was harmless, because the jurors were present for the experts' testimony and were able to draw their own individual conclusions regarding what the experts conveyed. These comments do not constitute fundamental error.

### Improper Instructions on Aggravating Circumstances

While instructing the jury on "merger" in considering the aggravating circumstances, the prosecutor stated, " . . . the robbery and financial gain merge . . . but all it really does is make you able to give more weight to the armed robbery circumstance." This Court has recognized in Brooks v. State, 762 So. 2d 879, 903 (Fla. 2000), that this is an improper comment, which violates the principles set forth in Provence v. State, 337 So. 2d 783, 786 (Fla. 1976). "If we were to allow the type of argument made by the prosecutor here, then an individual who commits

a capital crime in the course of robbery would always begin with a 'more weighty' aggravating circumstance than those who commit a capital crime in the course of any other enumerated felony." Brooks, 762 So. 2d at 903. Similar to this case, the defense counsel in Brooks did not object to the prosecutor's line of argument on this issue. Id. at 902 n.33.

Although in Brooks this Court determined that the merger argument made by the prosecutor was improper, this Court did not determine, or even imply, that this comment alone would be a basis for finding fundamental error. This Court granted Brooks a new penalty phase after it considered "the jury's close seven-to-five recommendation that Brooks be sentenced to death . . . and the objected-to comments . . . when viewed in conjunction with the unobjected-to comments." Id. at 899. We find that in this case, where the jury recommended imposition of the death penalty by an 11-1 vote and the comments that the defense raises in this proceeding were not continuous, this improper instruction on the merged aggravators does not rise to the level of fundamental error. This is especially true when the trial court did not repeat this misstatement of the law when instructing the jury on the merged aggravators, immediately prior to deliberations, and defense counsel stated on the record that he had no objection to the court's instruction.

The next comment that the defense argues was improper was the prosecutor's comment made to the jury in instructing the jury on the HAC aggravator:

> Designed to inflict a high degree of pain with utter indifference to the suffering of Mr. Scott.
> Then the law goes a little further and tells you that the kind of crime that is intended here to be defined as heinous, atrocious or cruel is one accompanied by additional acts that show the crime was conscienceless or pitiless, and was unnecessarily tortuous to the victim.
> Now when you think about the death of Mr. Scott and what was going on in total in that room, what shows consciencelessness? He put his hand between Ms. White's legs and said thank you, after he just beat the hell out of her and raped her. It wasn't just rape. It was conscienceless and pitiless, and Mr. Scott was the person that suffered the death that Mr. Poole's being punished for.

As recognized by the prosecutor in his argument, this Court has defined the HAC aggravator as being "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." See State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973) (emphasis added).

The State argues that the touching of White should be considered in the HAC analysis, based on the totality of the circumstances. In Baker v. State, 71 So. 3d 802, 821 (Fla. 2011), this Court cited several instances where HAC could still be found despite the fact that the victim ultimately died from summary execution, such as a single gunshot wound to the head. This Court explained that "[t]he common element in these cases is that, before the instantaneous death occurred, the

victims were subjected to agony over the prospect that death was soon to occur." Id. at 821 (citing Routly v. State, 440 So. 2d 1257, 1265 (Fla.1983). Thus, HAC was found based on the totality of the circumstances where "the facts of this case demonstrate a series of acts, each of which was committed with utter indifference to the suffering of the [murder] victim and subjected [the murder victim] to prolonged physical and emotional torment." Id.

In this case, White testified that when Poole would try to rape her, Scott would get up, and that Mr. Poole would pick up the tire iron and hit Scott in the face with it. White then explained that Poole did, in fact, rape her. Id. White then explained that after Poole left the room, she got off the bed and pulled on Scott and could hear him breathe. She testified that after she vomited and fell to the floor again, Poole came back into the room and touched her vaginal area and said "thank you." White does not mention any further contact between Poole and Scott after Poole repeatedly hit Scott with the tire iron. While Scott was aware of Poole's attempts to rape White, there is no indication that Scott was still conscious when Poole left the room and returned. Thus, Scott cannot be said to have suffered emotional torment by Poole's touching of White's vaginal area and simultaneous comment. Therefore, the proven facts do not support this statement.

In light of defense counsel's failure to object to this comment at trial, the next inquiry is whether this misstatement amounts to fundamental error. As

- 28 -

observed by the trial court's sentencing order, this Court has "consistently upheld HAC in beating deaths," particularly where the victim is conscious for at least a part of the attack and is aware of impending death. See Williams v. State, 37 So. 3d 187, 198-99 (Fla. 2010); Bogle v. State, 655 So. 2d 1103, 1109 (Fla. 1995). Based on White's testimony regarding the suffering experienced by Scott before he was rendered unconscious, there is no reasonable doubt that the HAC aggravator would have been found despite the prosecutor's improper instruction to consider what happened to White at the point where it is not clear whether Scott was conscious to hear or see what took place. Additionally, this misstatement was not repeated by the trial court when it instructed the jury on HAC immediately prior to deliberations. Thus, the prosecutor's direction does not constitute fundamental error.

## Cumulative Impact of All Errors

We view the defense's claims of prosecutorial misconduct in context of the entire argument and the testimony presented to the jury and find that the misconduct does not constitute fundamental error. The improper arguments made by the prosecutor do not appear to be "so egregious as to warrant reversal" or "reach[] critical mass of fundamental error," because many of the errors complained of are harmless.

## PROPORTIONALITY

In reviewing a case to determine whether a death sentence is proportional, this Court's task is not to compare the number of aggravating and mitigating circumstances; rather, this Court must thoughtfully consider the totality of the circumstances in a case and compare it with other capital cases. Beasley v. State, 774 So. 2d 649, 673 (Fla. 2000) (internal quotation marks omitted).

In this case, Poole was convicted of first-degree murder, attempted first-degree murder, armed burglary with intent to commit an assault or battery with a weapon, sexual battery with great force, and armed robbery with a deadly weapon. The jury recommended the death penalty by a vote of eleven to one. The trial court found that such a punishment was appropriate after considering all of the evidence and properly weighing the aggravators against the mitigators. Specifically, the court found four aggravating factors, two statutory mitigators, and eleven nonstatutory mitigators. In sentencing Poole to death, the trial court determined that "the heinous, atrocious or cruel aggravator alone outweighs all mitigating circumstances in this case."

The circumstances of this case are similar to other cases in which this Court has upheld the death penalty. See Orme v. State, 677 So. 2d 258, 263 (Fla. 1996) (holding the death sentence proportional for the sexual battery, beating, and strangulation of victim where there were three statutory aggravators—HAC,

- 30 -

pecuniary gain, and sexual battery—and both statutory mental mitigators); Johnston v. State, 841 So. 2d 349, 360-61 (Fla. 2002) (holding the death sentence proportional with four aggravators found (prior violent felony, sexual battery, pecuniary gain and HAC), and statutory mitigator that defendant's ability to conform his conduct to the requirements of the law was substantially impaired, in addition to numerous nonstatutory mitigators)). Comparing these circumstances with those of the foregoing and other capital cases, death is proportionate.

## RING V. ARIZONA

The defense submits that for all practical purposes, Florida is a "judge sentencing" state within the meaning and constitutional analysis of Ring, 536 U.S. 584 (2002) and therefore its entire capital sentencing scheme violates the Sixth Amendment. This same issue was rejected in Poole's 2008 direct appeal of his death sentence. Poole, 997 So. 2d at 396. This Court has repeatedly held that Florida law does not require jury findings on aggravating circumstances. See State v. Steele, 921 So. 2d 538 (Fla. 2005). This Court has also consistently held that Ring, does not apply to cases when the prior violent felony or the prior capital felony aggravating factor is applicable. See Martin v. State, 107 So. 3d 281, 322 (Fla. 2012); Hodges v. State, 55 So. 3d 515, 540 (Fla. 2010), cert. denied, 132 S. Ct. 164 (2011). The jury unanimously found that Poole committed the crimes of attempted first-degree murder of White, sexual battery of White, armed burglary

and armed robbery, during the course of the first degree murder of Noah Scott. Poole, 997 So. 2d at 396.  Therefore, relief on this claim is not warranted.

**CONCLUSION**

For the reasons stated above, we uphold the trial court's imposition of the death penalty on resentencing.

POLSTON, C.J., and LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


PARIENTE, J., concurring in result.

While I concur in the result that the majority reaches, I disagree with the majority's conclusion that the fingertip was admissible, particularly since the majority fails to analyze whether less graphic methods were available to illustrate the same point.  Majority op. at 18-20.  Defense counsel objected to the admission of the fingertip on the basis that it was prejudicial and photographs could also illustrate this injury without the extremely inflammatory effect of admitting a jar containing the victim's actual flesh.  The prosecutor argued that the fingertip should be admissible because Poole had been convicted of attempted first-degree murder and the admission of this body part in a jar should not be considered inflammatory because people would see this type of item in a biology class.  The

trial court accepted this argument and admitted the fingertip, concluding that the fingertip was "not unpleasant" to see and simply appeared to be a large chunk of skin and the end of a finger.

I conclude that this ruling was error because the trial court failed to analyze whether there was a less graphic method of illustrating the same point, such as through the introduction of photographs. As this Court has held, even when dealing with photographs of a murder victim that are deemed relevant, the key question for determining admissibility is whether less graphic photographs are available to illustrate the same point:

> "The test for admissibility of photographic evidence is relevancy rather than necessity." Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived. This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner's testimony, the manner of death, or the location of the wounds.
> However, even where photographs are relevant, the trial court must still determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence." In making this determination, the trial court should "scrutinize such evidence carefully for prejudicial effect, <u>particularly when less graphic photos are available to illustrate the same point</u>."

Doorbal v. State, 983 So. 2d 464, 497 (Fla. 2008) (emphasis added) (quoting Douglas v. State, 878 So. 2d 1246, 1255 (Fla. 2004)).

Relevancy is the starting point, not the ending point. In this case, neither the trial court nor this Court evaluated whether there was a less graphic means available to illustrate the fact that Poole was previously convicted of attempted first-degree murder. However, when this objection was raised, both the trial court and the parties recognized that pictures demonstrated this injury, that the victim herself would be testifying, and that her injury was still visible.

In support of its argument that the trial court did not err, the State relies solely upon out-of-state cases in which a human bone was admitted into evidence to address a disputed fact. See State v. Pike, 978 S.W.2d 904, 911, 924 (Tenn. 1998) (introducing a piece of skull found in the defendant's clothing and placing this piece of bone into the victim's reconstructed skull to show that the defendant possessed a part of the victim's skull—evidence that the court found was no more prejudicial than the use of a model skull would have been); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994) (admitting a skull on the basis that a forensic anthropologist found a "signature" for the murder weapon and thus the "cleaned, reconstructed skull was highly relevant in establishing identity"); Hilbish v. State, 891 P.2d 841, 850 (Alaska Ct. App. 1995) (holding that the trial court did not err in admitting a cleaned skull to assist the jury in understanding the location of the gunshot wound and noting that the skull was less gruesome than available photographs might have been).

However, a closer review of each case shows that the state courts allowed the introduction of the cleaned bone to establish the identity of the murder victim or address an issue in dispute and that each court considered both the relevancy of the evidence and the ability of presenting the same information in a less prejudicial or graphic format. In fact, in Crain v. State, 736 N.E.2d 1223, 1233 (Ind. 2000), the Indiana Supreme Court expressed its concern regarding the State's use of the victim's actual skull, but stressed that because the use of the skull was relevant given the defendant's claim of accidental death and because the skull was not gruesome, but was only cleaned bone, the trial court did not abuse its discretion.

A critical difference between those cases and this one is the fact that the evidence at issue here is not a cleaned bone, but the surviving victim's very flesh that had been preserved in a jar. Moreover, the necessity of admitting this type of evidence is questionable—here, the evidence is relevant only to show the force that Poole exerted when he tried to kill the surviving victim, but the amount of force is not relevant in proving the aggravator related to the attempted murder conviction. The fact that Poole was convicted of attempted murder is not disputed. In addition and importantly, the trial court never weighed the necessity of introducing the flesh, as opposed to admitting this evidence through a less gruesome means, like photographs as Poole requested.

I am concerned that the majority's holding, which concludes that there was no abuse of discretion and which does not analyze whether less gruesome methods existed to demonstrate the same point, is an incomplete analysis. While I agree that in this case the admission constitutes harmless error, I urge trial courts to exercise caution before admitting an actual body part and to consider whether less gruesome and prejudicial ways exist to demonstrate the same point.

An Appeal from the Circuit Court in and for Polk County,
J. Michael Hunter, Judge - Case No. CF01-7078A-XX

James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Bartow, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Scott Andrew Browne, Assistant Attorney General, Tampa, Florida,

for Appellee