# Supreme Court of Florida

_____

No. SC18-245
_____

**STATE OF FLORIDA,**
Appellant/Cross-Appellee,

vs.

**MARK ANTHONY POOLE,**
Appellee/Cross-Appellant.

January 23, 2020

PER CURIAM.

The State of Florida appeals from a postconviction order setting aside Mark

Anthony Poole's 2011 death sentence for the 2001 murder of Noah Scott. The

sentence became final in 2015. *Poole v. State (Poole II)*, 151 So. 3d 402 (Fla.

2014), *cert. denied*, 135 S. Ct. 2052 (2015).[1] The trial court set aside the sentence

and ordered a new penalty phase proceeding after finding the sentence to have

been imposed in violation of the United States and Florida Constitutions as

interpreted and applied in *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). Arguing that

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.; *State v. Fourth Dist. Court of Appeal*, 697 So. 2d 70, 71 (Fla. 1997).

Poole suffered no constitutional deprivation in his sentencing proceeding, the State requests that we reexamine and partially recede from *Hurst v. State*.

Poole filed a cross-appeal, arguing that his trial counsel's concession of guilt on related non-homicide offenses violated his Sixth Amendment right to counsel and constituted structural error requiring reversal of his convictions and a new guilt phase trial.

We address the cross-appeal first because relief on Poole's guilt phase postconviction claim would moot the sentencing issue. The trial court rejected the guilt phase claim, and we affirm the trial court as to this issue because Poole did not preserve the issue for review on appeal. As for the sentencing issue, we agree with the State that we must recede from *Hurst v. State* except to the extent that it held that a jury must unanimously find the existence of a statutory aggravating circumstance beyond a reasonable doubt. Accordingly, we reverse the portion of the trial court's order setting aside Poole's sentence.

## BACKGROUND

The opinion on direct appeal set out the following facts:

> Mark Anthony Poole was convicted of the first-degree murder of Noah Scott, attempted first-degree murder of Loretta White, armed burglary, sexual battery of Loretta White, and armed robbery. Poole was convicted based on the following facts presented at trial. On the evening of October 12, 2001, after playing some video games in the bedroom of their mobile home, Noah Scott and Loretta White went to bed sometime between 11:30 p.m. and 12 a.m. Later during the night, White woke up with a pillow over her face and Poole sitting on top of

- 2 -

her. Poole began to rape and sexually assault her as she begged Poole not to hurt her because she was pregnant. As White struggled and resisted, Poole repeatedly struck her with a tire iron. She put her hand up to protect her head, and one of her fingers and part of another finger were severed by the tire iron. While repeatedly striking White, Poole asked her where the money was. During this attack on White, Scott attempted to stop Poole, but was also repeatedly struck with the tire iron. As Scott struggled to defend White, Poole continued to strike Scott in the head until Scott died of blunt force head trauma. At some point after the attack, Poole left the bedroom and White was able to get off the bed and put on clothes but she passed out before leaving the bedroom. Poole came back in the bedroom and touched her vaginal area and said "thank you." White was in and out of consciousness for the rest of the night. She was next aware of the time around 8 a.m. and 8:30 a.m. when her alarm went off.

When her alarm went off, White retrieved her cell phone and called 911. Shortly thereafter, police officers were dispatched to the home. They found Scott unconscious in the bedroom and White severely injured in the hallway by the bedroom. White suffered a concussion and multiple face and head wounds and was missing part of her fingers. Scott was pronounced dead at the scene. Evidence at the crime scene and in the surrounding area linked Poole to the crimes. Several witnesses told police officers that they saw Poole or a man matching Poole's description near the victims' trailer on the night of the crimes. Stanley Carter stated that when he went to the trailer park around 11:30 that night, he noticed a black male walking towards the victims' trailer. Carter's observations were consistent with that of Dawn Brisendine, who knew Poole and saw him walking towards the victims' trailer around 11:30 p.m. Pamela Johnson, Poole's live-in girlfriend, testified that on that evening, Poole left his house sometime in the evening and did not return until 4:50 a.m.

Poole was also identified as the person selling video game systems owned by Scott and stolen during the crime. Ventura Rico, who lived in the same trailer park as the victims, testified that on that night, while he was home with his cousin's girlfriend, Melissa Nixon, a black male came to his trailer and offered to sell him some video game systems. Rico agreed to buy them for $50, at which point the black male handed him a plastic trash bag. During this exchange,

Nixon got a good look at the man and later identified Poole when the police showed her several photographs. Nixon testified that the next morning, when her son was going through the trash bag, he noticed that one of the systems had blood on it.

Pamela Johnson also testified that on the same morning, she found a game controller at the doorstep of Poole's house, she handed it to Poole, and Poole put it in his nightstand. She indicated that she had never seen that game controller before that morning and did not know what it would be used for because neither she nor Poole owned any video game systems. During the search of Poole's residence, the police retrieved this controller. In addition, the police retrieved a blue Tommy Hilfiger polo shirt and a pair of Poole's Van shoes, shoes Poole said he had been wearing on the night of the crimes. A DNA analysis confirmed that the blood found on the Sega Genesis box, Super Nintendo, Sega Dreamcast box and controller matched the DNA profile of Scott. Also, a stain found on the left sleeve of Poole's blue polo shirt matched White's blood type. The testing of a vaginal swab also confirmed that the semen in White was that of Poole. A footwear examination revealed that one of the two footwear impressions found on a notebook in the victims' trailer matched Poole's left Van shoe. The tire iron used in the crimes was found underneath a motor home located near the victims' trailer. A DNA analysis determined that the blood found on this tire iron matched Scott's DNA profile.

*Poole v. State* (*Poole*), 997 So. 2d 382, 387-88 (Fla. 2008) (footnote omitted).

The trial began on April 21, 2005, and the jury returned a verdict six days later finding Poole guilty of all charges, namely first-degree murder of Noah Scott, attempted first-degree murder of Loretta White, armed burglary, sexual battery of Loretta White, and armed robbery. The penalty phase began on May 2, 2005. The jury recommended death by a vote of twelve to zero two days later, which allowed

the trial court to consider a death sentence under section 921.141, Florida Statutes (2005).  On August 25, 2005, the trial court sentenced Poole to death.

On direct appeal Poole raised a number of challenges to his convictions and death sentence, including that his death sentence violated the dictates of *Ring v. Arizona*, 536 U.S. 584 (2002), because Florida's statutory sentencing scheme did not require the jury to unanimously find all of the aggravators necessary to impose a death sentence.  *Poole*, 997 So. 2d at 396.  This Court rejected that argument, holding that Florida's capital sentencing scheme was not unconstitutional pursuant to *Ring*.  *Id.*  Alternatively, we held that Poole's case fell outside the scope of *Ring* because the jury had unanimously found that Poole committed other violent felonies during the murder—specifically attempted first-degree murder, sexual battery, armed burglary, and armed robbery.  *Id.*  Those convictions unanimously found by Poole's jury formed the basis of one of the statutory aggravators found by the trial court—that Poole had prior violent felony convictions.  *Id.*  Thus, this case fell "outside the scope of *Ring*."  *Id.*  However, this Court determined that Poole was entitled to a new penalty phase proceeding because the prosecutor improperly introduced inadmissible nonstatutory aggravation by cross-examining witnesses about unproven prior arrests and the unproven content of a tattoo on Poole's body.  *Id.* at 393-94.  We vacated Poole's sentence of death and remanded for a new penalty phase.  *Id.* at 394.

On June 29, 2011, following a new penalty phase, the jury recommended death by a vote of 11 to 1. *Poole II*, 151 So. 3d at 408. The trial court found four aggravating circumstances: (1) the contemporaneous conviction for the attempted murder of Loretta White (very great weight); (2) the capital felony occurred during the commission of burglary, robbery, and sexual battery (great weight); (3) the capital felony was committed for financial gain (merged with robbery but not burglary or sexual battery) (less than moderate weight); and (4) the capital felony was committed in a heinous, atrocious, or cruel (HAC) manner (very great weight). *Id.* Again, three of these four aggravators were found unanimously by the jury because the jury found Poole guilty of the other charged crimes on which these aggravators are based.

The trial court found two statutory mitigating circumstances: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (moderate to great weight); and (2) the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (great weight). It found eleven nonstatutory mitigating circumstances:

> (1) borderline intelligence (little weight); (2) defendant dropped out of school (very little weight); (3) loss of father figure had emotional effect and led to his drug abuse (very little weight); (4) defendant sought help for drug problem (very little weight); (5) defendant had an alcohol problem at time of crime (very little weight); (6) drug abuse problem at time of crime (very little weight); (7) defendant has a relationship with

son (very little weight); (8) strong work ethic (very little weight); (9) defendant is a religious person (very little weight); (10) dedicated uncle (very little weight); and (11) defendant needs treatment for mental disorder unrelated to substance abuse (very little weight). The trial court determined that the proposed mitigator that the defendant has severe chronic alcohol and cocaine problem for which he needs treatment was not proven.

*Id.*

The trial court concluded that the aggravating factors far outweighed the mitigating circumstances; specifically, the HAC aggravator alone outweighed all mitigating circumstances. *Id.* Accordingly, the trial court sentenced Poole to death on August 19, 2011, and we upheld the trial court's resentencing on June 26, 2014. *Id.* at 419.

On April 8, 2016, Poole filed his initial postconviction motion, raising two issues pertinent to this appeal: (1) counsel was ineffective for conceding that Poole committed the nonhomicide offenses; and (2) Poole is entitled to resentencing because the jury did not make the findings required by *Hurst v. State*.

The trial court entered an interim order vacating Poole's death sentence pursuant to *Hurst v. State*, finding the error was not harmless because the jury's recommendation of death was not unanimous. Following an evidentiary hearing, the trial court denied Poole's claim that counsel was ineffective for conceding guilt on the nonhomicide offenses. The trial court granted the State's request for a stay of its order requiring a new penalty phase, pending this appeal.

## GUILT PHASE CLAIM

Poole argues that he is entitled to a new trial because, over his express objections, defense counsel conceded Poole's guilt on the non-homicide offenses. Poole bases this claim on *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018).[2] The State argues that Poole failed to preserve the specific legal argument that he raises on appeal and thus this issue was waived. We agree.

"In order to preserve an issue for appeal, the issue 'must be presented to the lower court and the *specific legal argument* or grounds to be argued on appeal must be part of that presentation.' " *Bryant v. State*, 901 So. 2d 810, 822 (Fla. 2005) (emphasis added) (quoting *Archer v. State*, 613 So. 2d 446, 448 (Fla. 1993)). Raising a claim for the first time during closing arguments is insufficient to preserve a postconviction claim. *Deparvine v. State*, 146 So. 3d 1071, 1103 (Fla. 2014). Rather, the specific legal argument must be raised in the postconviction motion. *Wickham v. State*, 124 So. 3d 841, 853 (Fla. 2013). Applying these principles here, we conclude that Poole did not preserve this claim for appellate review.

---

2. In *McCoy*, the Supreme Court reviewed a state supreme court decision affirming the petitioner's murder conviction on direct appeal. *See McCoy*, 138 S. Ct. at 1507. The Supreme Court decided McCoy on direct appeal. Because we have concluded that Poole did not preserve his guilt phase claim for appellate review, we need not address how *McCoy*'s holding applies in the postconviction context. *See Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017).

In his postconviction motion, Poole argued that counsel's concession of guilt on the nonhomicide offenses violated Poole's rights to remain silent and to the attorney-client privilege under the Fifth and Sixth Amendments. Poole emphasized the specific wording of counsel's concession, noting that counsel told the jury that Poole "acknowledges" that he committed burglary, sexual battery, and robbery. Poole contrasted "acknowledging" that a defendant committed a crime with simply conceding that a charge has been proven by the state. In the former case, according to Poole's motion, "the attorney-client privilege is violated, and the right to remain silent is waived, opening the door to rebuttal evidence and argument."

The argument that Poole now raises on appeal did not appear until written closing argument. Only then did Poole assert that counsel's concession of guilt without Poole's consent violated Poole's constitutional rights. Poole's written closing argument presented this argument as one of "two errors," each of which "individually would constitute grounds for vacating Mr. Poole's conviction." (The other error, of course, was the one he asserted in his postconviction motion—the alleged violation of Poole's rights to remain silent and to the attorney client privilege.) Poole presented each argument under a separate heading in his closing argument memorandum and said that the second argument (his original argument) provided "additional grounds for vacating Mr. Poole's conviction."

Poole's postconviction motion did not present the specific legal argument that he now presses on appeal. Raising the argument in his post-hearing, written closing argument memorandum was insufficient. Therefore, we hold that Poole did not preserve his guilt phase argument for our review on appeal.

## SENTENCING PHASE CLAIM

We now turn to the State's argument that Poole suffered no constitutional deprivation in his sentencing proceeding and that we should partially recede from *Hurst v. State*.

### I. Statutory and Legal Background

#### A. Florida's Capital Sentencing Law

Poole was sentenced to death under the familiar statutory framework that governed Florida's capital sentencing proceedings from 1973 until 2016. Florida adopted that framework in response to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). "A fair statement of the consensus expressed by the Court in *Furman* is that 'where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' " *Zant v. Stephens*, 462 U.S. 862, 874 (1983) (quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality opinion)). The Supreme Court has fleshed out this principle by requiring states to

narrow the class of death-eligible murders and by mandating individualized sentencing that considers offender-specific mitigating circumstances.

Florida's capital sentencing procedures begin with an evidentiary hearing at which the judge and jury hear evidence relevant to the nature of the crime and the character of the defendant, including statutory aggravating and mitigating circumstances. § 921.141(1), Fla. Stat. (2011).[3] Next the jury deliberates and renders an "advisory sentence" to the court. § 921.141(2), Fla. Stat. Finally, "[n]otwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances," must enter a sentence of life imprisonment or death. § 921.141(3), Fla. Stat. If the court imposes a sentence of death, it is required to issue written findings "upon which the sentence of death is based as to the facts: (a) [t]hat sufficient aggravating circumstances exist as enumerated in subsection (5); and (b) [t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." *Id*.

Soon after the legislature adopted this capital sentencing framework, this Court in *State v. Dixon*, 283 So. 2d 1 (Fla. 1973), considered whether the new law passed muster under *Furman*. The Court concluded that it did, because the

---

3. For simplicity, unless otherwise indicated, throughout our discussion we refer in the present tense to Florida's capital sentencing law as it existed in 2011, when Poole was resentenced.

- 11 -

statutory scheme "controlled and channeled" discretion "until the sentencing process becomes a matter of reasoned judgment." *Id*. at 10.

**B. From *Proffitt* to *Walton***

In several cases that are directly relevant to the issues before us now, the Supreme Court itself considered and rejected Sixth and Eighth Amendment challenges to Florida's post-*Furman* capital sentencing law. In *Proffitt v. Florida*, 428 U.S. 242 (1976), the Court took up the question whether Florida's capital sentencing system complied with the Eighth Amendment. The Court noted that, in Florida, the "jury's verdict is determined by majority vote. It is only advisory; the actual sentence is determined by the trial judge." *Id*. at 248-49. No matter, the Court concluded, because the Court's decisions had "never suggested that jury sentencing is constitutionally required." *Id*. at 252. The Court's ultimate holding in *Proffitt* was that "[o]n its face the Florida system . . . satisfies the constitutional deficiencies identified in *Furman*." *Id*. at 253.

Next, in *Spaziano v. Florida*, 468 U.S. 447, 457 (1984), the Supreme Court considered whether Florida's capital sentencing system violated the Sixth or Eighth Amendment by allowing the trial judge to override a jury's recommendation of life. *Id*. at 457. As to the Sixth Amendment, the Court observed that, "despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a

- 12 -

determination of the appropriate punishment to be imposed on an individual." *Id.* at 459. And "[t]he Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue." *Id.* The Court also found no Eighth Amendment violation in the possibility of a jury override: "We are not persuaded that placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision." *Id.* at 465. The Court concluded that "there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed." *Id.*

Finally, in *Hildwin v. Florida*, 490 U.S. 638, 639 (1989), the Supreme Court considered a claim that "the Florida capital sentencing scheme violates the Sixth Amendment because it permits the imposition of death without a specific finding by the jury that sufficient aggravating circumstances exist to qualify the defendant for capital punishment." The Court rejected the claim, reasoning that "the existence of an aggravating factor here is not an element of the offense but instead is 'a sentencing factor that comes into play only after the defendant has been found guilty.' " *Id.* at 640 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 86 (1986)). Based on that premise, the Court held that "the Sixth Amendment does not require

- 13 -

that the specific findings authorizing the imposition of the sentence of death be made by the jury." *Id*. at 640-41.

A final, non-Florida case bears explaining before we turn to the cases that led directly to *Hurst v. State*. Decided one year after *Spaziano*, *Walton v. Arizona*, 497 U.S. 639 (1990), involved a challenge to Arizona's capital sentencing law, which required the trial court to find and weigh aggravating and mitigating circumstances before imposing a death sentence. The Arizona law under review did not include any role for the jury in the capital sentencing process. The petitioner in *Walton* argued that "every finding of fact underlying the sentencing decision must be made by a jury, not by a judge" and that therefore "the Arizona scheme would be constitutional only if a jury decides what aggravating and mitigating circumstances are present in a given case and the trial judge then imposes sentence based on those findings." *Id*. at 647. The Court rejected that claim, relying largely on *Hildwin* and the Court's other decisions upholding Florida's capital sentencing system.

The argument that Florida's advisory jury verdict materially distinguished the two states' systems did not persuade the Court. Instead, the Court emphasized that Florida's capital jury does not make specific factual findings about aggravators and mitigators and that the jury's recommendation is not binding on the trial judge. *Id*. at 647-48. The Court reasoned that "[a] Florida trial court no more has the

- 14 -

assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona." *Id*. at 648. The Court also rejected the argument that, in Arizona, aggravating factors were "elements of the offense." *Id*. The Court ultimately held that "the Arizona capital sentencing scheme does not violate the Sixth Amendment." *Id*. at 649.

### C. *Apprendi* and *Ring*

The Court's retreat from the rationale underlying the Sixth Amendment holdings of *Spaziano*, *Hildwin*, and *Walton*—specifically, that aggravators are sentencing factors rather than de facto elements of the crime of capital murder— began with the seminal case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Apprendi had pleaded guilty to illegal possession of a firearm, an offense that carried a maximum punishment of ten years' imprisonment. Later, in a separate sentencing proceeding, the trial court found by a preponderance of the evidence that Apprendi had also violated a New Jersey hate crime sentencing statute. That judicial finding resulted in Apprendi being sentenced to a term of imprisonment two years above the statutory maximum for the base firearm offense. The Supreme Court described the question presented in *Apprendi* as whether the Fourteenth Amendment's Due Process Clause "requires that a factual determination authorizing an increase in the maximum prison sentence for an

offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *Id*. at 469.

The Court's analysis proceeded from the foundational principle that the Fifth Amendment (due process) and the Sixth Amendment (jury trial) combine to "entitle a criminal defendant to a 'jury determination . . . of every element of the crime with which he is charged, beyond a reasonable doubt.' " *Id*. at 477 (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)). From that principle the Court derived the more specific rule that is the central holding of *Apprendi*: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Id*. at 490 (Stevens, J., concurring) (alteration in original) (quoting *Jones v. United States*, 526 U.S. 227, 252-53 (1999)). The only exception to this rule is "the fact of a prior conviction." *Id*.

Most pertinent to our case here, the Court in *Apprendi* rejected New Jersey's argument that the factual finding supporting Apprendi's hate crime sentencing enhancement was a mere "sentencing factor," rather than a fact that constitutes an element of the offense. *Id*. at 494. The Court stated: "Despite what appears to us the clear 'elemental' nature of the factor here, the relevant inquiry is one not of

- 16 -

form but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict[.]" *Id*.

In the penultimate paragraph of its opinion, the Court anticipated and rejected the argument that "the principles guiding" its decision "render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." *Id*. at 496. The Court deemed the capital cases "not controlling" because, according to the Court, the offenses of conviction in those cases already subjected the defendant to a sentence of death; the aggravating factor findings merely informed the judge's choice of life or death. *Id*. This reasoning turned out to be short-lived.

Two years later, *Ring v. Arizona*, 536 U.S. 584 (2002), gave the Supreme Court the opportunity to apply its *Apprendi* rule in the capital sentencing context. As we explained earlier, capital sentencing hearings under Arizona law were conducted by the trial court alone, and the court made all required findings. *Id*. at 592. As in Florida, Arizona law provided that a death sentence could not be imposed unless at least one aggravating factor was found to exist beyond a reasonable doubt. *Id*. at 597. The Court framed the question presented as "whether that aggravating factor may be found by the judge, as Arizona law

specifies, or whether the Sixth Amendment's jury trial guarantee . . . requires that the aggravating factor determination be entrusted to the jury." *Id.*

The Court acknowledged its earlier decision in *Walton* upholding Arizona's capital sentencing scheme against a similar Sixth Amendment challenge. The Court recognized that *Walton* had characterized Arizona's required aggravating factors as "sentencing considerations" rather than "elements of the offense." *Id.* at 598. But the Court explained that *Apprendi* had since clarified that the Sixth Amendment inquiry must focus on effect rather than form: "If a State makes an increase in a defendant's authorized punishment contingent on a finding of fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id.* at 602.

With that baseline established, the Court revisited whether, as the *Walton* decision had assumed, a first-degree murder conviction in Arizona necessarily included all the jury findings necessary to expose the defendant to a death sentence. The Court looked to an Arizona Supreme Court decision holding that the answer is no—"Defendant's death sentence required the judge's factual findings." *Id.* at 603 (quoting *State v. Ring*, 25 P.3d 1139, 1151 (Ariz. 2001)). "Recognizing that the Arizona court's construction of the State's own law is authoritative," the Court concluded that "*Walton*, in relevant part, cannot survive the reasoning of *Apprendi*." *Id.* The Court ended its opinion:

> [W]e overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury.

*Id*. at 609 (citations omitted) (quoting *Apprendi*, 534 U.S. at 494 n.19).

Justice Breyer declined to join the Court's opinion. He concurred in the judgment, however, on the ground that he "believe[d] that jury sentencing in capital cases is mandated by the Eighth Amendment." *Id*. at 614 (Breyer, J., concurring in the judgment).

## D. *Hurst v. Florida*

It was not until *Hurst v. Florida*, 136 S. Ct. 616 (2016), that the Supreme Court addressed the significance of *Ring* for the constitutionality of Florida's capital sentencing procedure. Although it ultimately chose to address only the Sixth Amendment in its decision, the Supreme Court granted certiorari on the question "[w]hether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of this Court's decision in *Ring v. Arizona*." *Hurst v. Florida*, 575 U.S. 902, 902 (2015).

In his briefing to the Supreme Court, Hurst made a Sixth Amendment argument and an Eighth Amendment argument. His Sixth Amendment argument was that "Florida's capital sentencing scheme violates the Sixth Amendment under *Ring v. Arizona* . . . because it assigns to the judge alone the power to render a

- 19 -

defendant eligible for the death penalty by finding aggravating circumstances." Reply Brief for Petitioner at 2, *Hurst v. Florida*, 136 S. Ct. 616 (2016) (No. 14-7505), 2015 WL 5138584 at * 2. Hurst's Eighth Amendment argument was that "Florida's capital sentencing scheme also violates the Eighth Amendment because it assigns to the judge the power to impose the death penalty." Reply Brief for Petitioner at 5.

The Court had little trouble concluding that "the analysis the *Ring* Court applied to Arizona's sentencing scheme applies equally to Florida's." *Hurst v. Florida*, 136 S. Ct. at 621-22. Pointing to section 921.141(3), Florida Statutes (2010), the Court noted that Florida law required the judge, not the jury, to find the "facts" necessary to impose the death penalty. *Id*. at 622. The Court said it was "immaterial" that Florida's system, unlike Arizona's, incorporated an advisory jury verdict. *Id*. The Court rejected the State's argument that "when Hurst's sentencing jury recommended a death sentence, it 'necessarily included a finding of an aggravating circumstance.' " *Id*. (quoting the State's brief). What mattered was that "the Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' " *Id*. (quoting § 775.082(1), Fla. Stat. (2010)).

The Court ultimately held that "Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore

unconstitutional." *Id*. at 624. And, paralleling the language it used in *Ring* to overrule *Walton*, the Court overruled *Spaziano* and *Hildwin* "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for the imposition of the death penalty." *Id*.

As we noted earlier, the Court's opinion did not address Hurst's Eighth Amendment argument. In fact, notwithstanding its earlier order, the Court described itself as having granted certiorari to resolve only "whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring*." *Id*. at 621. In a solo concurrence, Justice Breyer did address the Eighth Amendment claim. Citing his own concurring opinion in *Ring*, he concluded that "the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death." *Id*. at 624 (Breyer, J., concurring in the judgement) (quoting *Ring*, 536 U.S. at 614).

### E. *Hurst v. State*

When Hurst's case returned to this Court on remand from the Supreme Court, it would have been reasonable to expect that the application of *Hurst v. Florida* would be straightforward. Hurst had asked the Supreme Court to find that Florida's capital sentencing statute violated the Sixth Amendment "because it assigns to the judge alone the power to render a defendant eligible for the death penalty by finding aggravating circumstances." Reply Brief for Petitioner at 2,

*Hurst v. Florida*, 136 S. Ct. 616 (2016) (No. 14-7505), 2015 WL 5138584 at *2.

In a relatively brief opinion that did not expand on *Ring*, the Supreme Court agreed. As Justice Canady correctly observed in his *Hurst v. State* dissent, "*Hurst v. Florida* simply applies the reasoning of *Ring* and *Apprendi* to Florida's death penalty statute and concludes that the jury's advisory role under Florida law does not satisfy the requirements of the Sixth Amendment." 202 So. 3d at 79 (Canady, J., dissenting). Years before, while it awaited definitive guidance from the Supreme Court, this Court had already addressed what it would mean "if *Ring* did apply in Florida": "we read [*Ring*] as requiring only that the jury make the finding of 'an element of a greater offense.' That finding would be that at least one aggravator exists . . . ." *State v. Steele*, 921 So. 2d 538, 546 (Fla. 2005) (citation omitted) (quoting *Ring*, 536 U.S. at 609).

Nonetheless, this Court on remand concluded that *Hurst v. Florida* had far greater implications for Florida's capital sentencing law. The new rule announced in *Hurst v. State* was as follows:

> [B]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating factors, and unanimously recommend a sentence of death.

202 So. 3d at 57.

The Court based its holding on several sources of law. The Court looked to *Apprendi*, *Ring*, and *Hurst* for the principle that the Sixth Amendment requires the jury to find "every fact . . . necessary for the imposition of the death penalty" and for the conclusion that each of these facts constitutes an "element." *Id*. at 53. Expanding on the Supreme Court's concept of "facts," the Court looked to the Florida statutes to identify "those critical findings that underlie the imposition of a death sentence." *Id*. at 51. The Court looked to article I, section 22 of the Florida Constitution[4] for the principle that jury verdicts must be unanimous on all the elements of criminal offenses—including the new capital sentencing "elements" that the Court had purported to identify. *See id*. at 55. And finally, "in addition to the requirements of unanimity that flow from the Sixth Amendment and from Florida's right to trial by jury," the Court concluded that "juror unanimity in any recommended verdict resulting in a death sentence is required under the Eighth Amendment." *Id*. at 59.

## II.     Analysis

The State asks us to recede from *Hurst v. State* "to the extent its holding requires anything more than the jury to find an aggravating circumstance—what *Hurst v. Florida* requires." We now explain how this Court erred in *Hurst v. State*

---

4. Article I, section 22 provides in pertinent part: "The right of trial by jury shall be secure to all and remain inviolate."

and why we have concluded that we must partially recede from our decision in that case.

**A. The Correct Understanding of *Hurst v. Florida***

It helps first to consider *Hurst v. Florida* in light of the principles underlying the Supreme Court's capital punishment cases. Those cases "address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). As to the eligibility decision, the Court has required that the death penalty be reserved for only a subset of those who commit murder. "To render a defendant eligible for the death penalty in a homicide case, [the Supreme Court has] indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id*. at 971-72. "[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877.

By contrast, the selection decision involves determining "whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972. The Supreme Court's cases require that the selection decision be an individualized determination that assesses the defendant's

- 24 -

culpability, taking into account "relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Id*.

*Hurst v. Florida* is about eligibility, not selection. We know this from the face of the Court's opinion: "Florida concedes that *Ring* required a jury to find every fact necessary to render Hurst *eligible* for the death penalty." *Hurst v. Florida*, 136 S. Ct. at 622 (emphasis added). We know it from the opinion's exclusive focus on aggravating circumstances, the central object of the Court's death eligibility jurisprudence. We know it because Hurst's counsel conceded it at oral argument. Transcript of Oral Argument at 12, *Hurst v. Florida*, 136 S. Ct. 616 (2016) (No. 14-7505). And most fundamentally, we know it from the *Apprendi*-based principle that animates the Court's decision: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Apprendi*, 530 U.S. at 490 (alteration in original) (quoting *Jones*, 526 U.S. at 252 (Stevens, J., concurring)).

Justice Scalia explained "the import of *Apprendi* in the context of capital-sentencing proceedings" this way:

> [F]or purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances." Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.

*Sattazahn v. Pennsylvania*, 537 U.S. 101, 111 (2003).

This of course describes Florida's capital sentencing law. As the Supreme Court itself noted in *Hurst v. Florida*, section 775.082(1), Florida Statutes, states that the punishment for a capital felony is life imprisonment unless "the procedure set forth in s. 921.141 results in findings by the court that such person shall be punished by death." The required trial court findings are set forth in section 921.141(3), Florida Statutes, which is titled "Findings in Support of Sentence of Death." When the Supreme Court referred to "the critical findings necessary to impose the death penalty," it referred to those findings as "facts" and cited section 921.141(3). *Hurst v. Florida*, 136 S. Ct. at 622. Tellingly, the Court did not cite section 921.141(2), which sets out the process for the jury to render an advisory verdict.

Section 921.141(3) requires two findings. One is an eligibility finding, the other a selection finding. The eligibility finding is in section 921.141(3)(a): "[t]hat sufficient aggravating circumstances exist as enumerated in subsection (5)." The selection finding is in section 921.141(3)(b): "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

We know that section 921.141(3)(a) is the eligibility finding because that is what our Court said repeatedly and consistently for many decades prior to *Hurst v. State*. In our first case interpreting Florida's post-*Furman* capital sentencing law,

we said: "When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided in Fla. Stat. s. 921.141(7)." *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973). Beginning with that holding, it has always been understood that, for purposes of complying with section 921.141(3)(a), "sufficient aggravating circumstances" means "one or more." *See Miller v. State*, 42 So. 3d 204, 219 (Fla. 2010) ("sufficient aggravating circumstances" means "one or more such circumstances"); *Zommer v. State*, 31 So. 3d 733, 754 (Fla. 2010) (same); *see also Douglas v. State*, 878 So. 2d 1246, 1265 (Fla. 2004) (Pariente, J., concurring as to conviction and concurring in result only as to sentence) ("A defendant convicted of first-degree murder cannot qualify for a death sentence unless at least one statutory aggravating factor is found to exist.").

Poole's suggestion that "sufficient" implies a qualitative assessment of the aggravator—as opposed simply to finding that an aggravator exists—is unpersuasive and contrary to this decades-old precedent. Likewise, our Court was wrong in *Hurst v. State* when it held that the existence of an aggravator and the sufficiency of an aggravator are two separate findings, each of which the jury must find unanimously. Under longstanding Florida law, there is only one eligibility finding required: the existence of one or more statutory aggravating circumstances.

## B. The Errors of *Hurst v. State*

This Court clearly erred in *Hurst v. State* by requiring that the jury make any finding beyond the section 921.141(3)(a) eligibility finding of one or more statutory aggravating circumstances. Neither *Hurst v. Florida*, nor the Sixth or Eighth Amendment, nor the Florida Constitution mandates that the jury make the section 941.121(3)(b) selection finding or that the jury recommend a sentence of death.

### 1. Sixth and Eighth Amendment Errors

*Weighing Under Section 941.121(3)(b).* Again, the *Apprendi* rule drives the Sixth Amendment inquiry: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Apprendi*, 530 U.S. at 490 (alteration in original) (quoting *Jones*, 526 U.S. at 252 (Stevens, J., concurring)). Only such "facts" are "elements" that must be found by a jury. The section 921.141(3)(b) selection finding—"that there are insufficient mitigating circumstances to outweigh the aggravating circumstances"—fails both aspects of the *Apprendi* test.

The section 921.141(3)(b) selection finding is not a "fact." As the Supreme Court observed in a case decided shortly after *Hurst v. Florida*, "the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy." *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016). That

stands in stark contrast to the "aggravating-factor determination," which is "a purely factual determination." *Id*. A subjective determination like the one that section 921.141(3)(b) calls for cannot be analogized to an element of a crime; it does not lend itself to being objectively verifiable. Instead, it is a "discretionary judgment call that neither the state nor the federal constitution entrusts exclusively to the jury." *State v. Wood*, 580 S.W.3d 566, 585 (Mo. 2019); *see also Hurst v. State*, 202 So. 3d at 82 (Canady, J., dissenting) (weighing of mitigators and aggravators is a determination that "require[s] subjective judgment").

We acknowledge that section 921.141(3)(b) requires a judicial finding "as to the fact[]" that the mitigators do not outweigh the aggravators. But the legislature's use of a particular label is not what drives the Sixth Amendment inquiry. *See Apprendi*, 530 U.S. at 494. In substance, what section 921.141(3)(b) requires "is not a finding of fact, but a moral judgment." *United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013) (describing balancing provision in federal death penalty statute).

In any event, even if we were to consider the section 921.141(3)(b) selection finding to be a fact, it still would not implicate the Sixth Amendment. The selection finding does not "expose" the defendant to the death penalty by increasing the legally authorized range of punishment. As we have explained, under longstanding Florida law, it is the finding of an aggravating circumstance

- 29 -

that exposes the defendant to a death sentence. The role of the section 921.141(3)(b) selection finding is to give the defendant an opportunity for mercy if it is justified by the relevant mitigating circumstances and by the facts surrounding his crime.

This passage from the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013), illuminates this point:

> Juries must find any facts that increase either the statutory maximum or minimum because the Sixth Amendment applies where a finding of fact both alters the legally prescribed range *and* does so in a way that aggravates the penalty. Importantly, this is distinct from factfinding used to guide judicial discretion in selecting a punishment "within limits fixed by law." While such findings of fact may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing.

*Id.* at 113 n.2 (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949)). And *Alleyne* merely echoes what the Supreme Court said in *Apprendi*: "We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." *Apprendi*, 530 U.S. at 481.

In sum, because the section 921.141(3)(b) selection finding is not a "fact" that exposes the defendant to a greater punishment than that authorized by the jury's guilty verdict, it is not an element. And because it is not an element, it need

not be submitted to a jury. *See Hurst v. Florida*, 136 S. Ct. at 621 (defining "element").

*Unanimous Jury Recommendation.* The *Hurst v. State* requirement of a unanimous jury recommendation similarly finds no support in *Apprendi*, *Ring*, or *Hurst v. Florida*. As we have explained, the Supreme Court in *Spaziano* upheld the constitutionality under the Sixth Amendment of a Florida judge imposing a death sentence even in the face of a jury recommendation of life—a jury override. It necessarily follows that the Sixth Amendment, as interpreted in *Spaziano*, does not require any jury recommendation of death, much less a unanimous one. And as we have also explained, the Court in *Hurst v. Florida* overruled *Spaziano* only to the extent it allows a judge, rather than a jury, to find a necessary aggravating circumstance. *See Hurst v. Florida*, 136 S. Ct. at 624.

Even without *Spaziano*, the *Apprendi* line of cases cannot be read to require a unanimous jury recommendation of death. Those cases are about what "facts"— those that are the equivalent of elements of a crime—the Sixth Amendment requires to be found by a jury. Sentencing recommendations are neither elements nor facts. As Justice Scalia said, the judgment in *Ring*—and by extension the judgment in *Hurst v. Florida*—"has nothing to do with jury sentencing." *Ring*, 536 U.S. at 612 (Scalia, J., concurring).

Finally, we further erred in *Hurst v. State* when we held that the Eighth Amendment requires a unanimous jury recommendation of death. The Supreme Court rejected that exact argument in *Spaziano*. *See Spaziano*, 468 U.S. at 465; *see also Harris v. Alabama*, 513 U.S. 504, 515 (1995) ("The Constitution permits the trial judge, acting alone, to impose a capital sentence."). We are bound by Supreme Court precedents that construe the United States Constitution.

## 2. State Law Errors

For many decades, this Court considered Florida's post-*Furman* sentencing procedures to be facially consistent with our state constitution. Even after *Ring*, in cases where the aggravator consisted of a prior violent felony, we rejected claims that Florida's capital sentencing scheme violated the right to a jury trial under our state constitution. *See, e.g.*, *Doorbal v. State*, 837 So. 2d 940, 963 (Fla. 2003).

We departed from those precedents in *Hurst v. State*, when we decided that article I, section 22 of the Florida Constitution requires a unanimous jury recommendation of a sentence of death and unanimous jury findings as to all the aggravating factors that were proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating factors. We based that holding on our determination that each of these findings is the equivalent of an element of an offense and on the

- 32 -

longstanding principle of Florida law that all elements must be found unanimously by the jury.

Here we already have explained that our holding in *Hurst v. State* was based on a mistaken view of what constitutes an element. Under the principles established in *Apprendi*, *Ring*, and *Hurst v. Florida*, only one of the findings we identified in *Hurst v. State*—the finding of the existence of an aggravating circumstance—qualifies as an element, including for purposes of our state constitution. There is no basis in state or federal law for treating as elements the additional unanimous jury findings and recommendation that we mandated in *Hurst v. State*. As to state law, subsequent to our decision in *Hurst v. State*, we already have receded from the holding that the additional *Hurst v. State* findings are elements. We held:

> To the extent that in *Perry v. State*, 210 So. 3d 630, 633 (Fla. 2016), we suggested that *Hurst v. State* held that the sufficiency and weight of the aggravating factors and the final recommendation of death are elements that must be determined by the jury beyond a reasonable doubt, we mischaracterized *Hurst v. State*, which did not require that these determinations be made beyond a reasonable doubt. Since *Perry*, in *In re Standard Criminal Jury Instructions in Capital Cases* and *Foster* [*v. State*, 258 So. 3d 1248 (Fla. 2018)], we have implicitly receded from its mischaracterization of *Hurst v. State*. We now do so explicitly. Thus, these determinations are not subject to the beyond a reasonable doubt standard of proof, and the trial court did not err in instructing the jury.

*Rogers v. State*, 44 Fla. L. Weekly S208, S212 (Fla. Sept. 5, 2019).

Last, lest there be any doubt, we hold that our state constitution's prohibition on cruel and unusual punishment, article I, section 17,[5] does not require a unanimous jury recommendation—or any jury recommendation—before a death sentence can be imposed. The text of our constitution requires us to construe the state cruel and unusual punishment provision in conformity with decisions of the Supreme Court interpreting the Eighth Amendment. Binding Supreme Court precedent in *Spaziano* holds that the Eighth Amendment does not require a jury's favorable recommendation before a death penalty can be imposed. *See Spaziano*, 468 U.S. at 464-65. Therefore, the same is true of article I, section 17.

## C. *Stare Decisis*

While this Court has consistently acknowledged the importance of *stare decisis*, it has been willing to correct its mistakes. In a recent discussion of *stare decisis*, we said:

> *Stare decisis* provides stability to the law and to the society governed by that law. Yet *stare decisis* does not command blind allegiance to precedent. "Perpetuating an error in legal thinking under the guise of stare decisis

---

5. Article I, section 17 provides in pertinent part: "Excessive fines, cruel and unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden. The death penalty is an authorized punishment for capital crimes designated by the legislature. The prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution."

serves no one well and only undermines the integrity and credibility of the court."

*Shepard v. State*, 259 So. 3d 701, 707 (Fla. 2018) (quoting *State v. Gray*, 654 So. 2d 552, 554 (Fla. 1995)).  Similarly, we have stated that "[t]he doctrine of stare decisis bends . . . where there has been an error in legal analysis."  *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002).  And elsewhere we have said that we will abandon a decision that is "unsound in principle."  *Robertson v. State*, 143 So. 3d 907, 910 (Fla. 2014) (quoting *Brown v. Nagelhout*, 84 So. 3d 304, 309 (Fla. 2012)).

It is no small matter for one Court to conclude that a predecessor Court has clearly erred.  The later Court must approach precedent presuming that the earlier Court faithfully and competently carried out its duty.  A conclusion that the earlier Court erred must be based on a searching inquiry, conducted with minds open to the possibility of reasonable differences of opinion.  "[T]here is room for honest disagreement, even as we endeavor to find the correct answer."  *Gamble v. United States*, 139 S. Ct. 1960, 1986 (2019) (Thomas, J., concurring).

In this case we cannot escape the conclusion that, to the extent it went beyond what a correct interpretation of *Hurst v. Florida* required, our Court in *Hurst v. State* got it wrong.  We say that based on our thorough review of *Hurst v. Florida*, of the Supreme Court's Sixth and Eighth Amendment precedents, and of our own state's laws, constitution, and judicial precedents.  Without legal

justification, this Court used *Hurst v. Florida*—a narrow and predictable ruling that should have had limited practical effect on the administration of the death penalty in our state as an occasion to disregard decades of settled Supreme Court and Florida precedent. Under these circumstances, it would be unreasonable for us *not* to recede from *Hurst v. State*'s erroneous holdings.

Invoking *North Florida Women's Health & Counseling Services, Inc. v. State*, 866 So. 2d 612 (Fla. 2003), Poole urges us to stand by our decision in *Hurst v. State*. Our opinion in *North Florida Women's Health* said that, before deciding to overrule a prior opinion, "we traditionally have asked several questions, including the following": whether the decision has proved unworkable; whether the decision could be reversed "without serious injustice to those who have relied on it and without serious disruption in the stability of the law;" and whether there have been drastic changes in the factual premises underlying the decision. *Id*. at 637. Though we do not doubt that this list of considerations could have been culled from our pre-*North Florida Women's Health* precedents, we note that the Court there offered no citation to support its compilation.

In the years since our decision in *North Florida Women's Health*, we have not treated that case as having set forth a *stare decisis* test that we must follow in every case. On the contrary, we have repeatedly receded from erroneous precedents without citing *North Florida Women's Health* or asking all the

questions it poses. *See, e.g.*, *Shepard*, 259 So. 3d at 707; *State v. Sturdivant*, 94 So. 3d 434, 440 (Fla. 2012); *Westgate Miami Beach, Ltd.* v. *Newport Operating Corp.*, 55 So. 3d 567, 574 (Fla. 2010); *Allstate Indem. Co. v. Ruiz*, 899 So. 2d 1121, 1131 (Fla. 2005).

More fundamentally, we are wary of any invocation of multi-factor *stare decisis* tests or frameworks like the one set out in *North Florida Women's Health*. They are malleable and do not lend themselves to objective, consistent, and predictable application. They can distract us from the merits of a legal question and encourage us to think more like a legislature than a court. And they can lead us to decide cases on the basis of guesses about the consequences of our decisions, which in turn can make those decisions less principled. Multi-factor tests or frameworks like the one in *North Florida Women's Health* often serve as little more than a toolbox of excuses to justify a court's unwillingness to examine a precedent's correctness on the merits.

We believe that the proper approach to *stare decisis* is much more straightforward. In a case where we are bound by a higher legal authority—whether it be a constitutional provision, a statute, or a decision of the Supreme Court—our job is to apply that law correctly to the case before us. When we are convinced that a precedent clearly conflicts with the law we are sworn to uphold, precedent normally must yield.

We say normally because "*stare decisis* means sticking to some wrong decisions." *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2409 (2015). "Indeed, *stare decisis* has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up." *Id*. But once we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent.

The critical consideration ordinarily will be reliance. It is generally accepted that reliance interests are "at their acme in cases involving property and contract rights." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). And reliance interests are lowest in cases—like this one—"involving procedural and evidentiary rules." *Id*.; *see also Alleyne*, 570 U.S. at 119 (Sotomayor, J., concurring) ("[W]hen procedural rules are at issue that do not govern primary conduct and do not implicate the reliance interests of private parties, the force of *stare decisis* is reduced.").

Here any reliance considerations cut against Poole. No one, including Poole, altered his behavior in expectation of the new procedural rules announced in *Hurst v. State*. To the extent that reliance interests factor here at all, they lean heavily in favor of the victims of Poole's crimes and of society's interest in holding Poole to account and in the substantial resources that have been spent litigating and adjudicating Poole's case.

We acknowledge that the Legislature has changed our state's capital sentencing law in response to *Hurst v. State*. Our decision today is not a comment on the merits of those changes or on whether they should be retained. We simply have restored discretion that *Hurst v. State* wrongly took from the political branches.

Having thoroughly considered the State's and Poole's arguments in light of the applicable law, we recede from *Hurst v. State* except to the extent it requires a jury unanimously to find the existence of a statutory aggravating circumstance beyond a reasonable doubt.

**CONCLUSION**

The jury in Poole's case unanimously found that, during the course of the first-degree murder of Noah Scott, Poole committed the crimes of attempted first-degree murder of White, sexual battery of White, armed burglary, and armed robbery. Under this Court's longstanding precedent interpreting *Ring v. Arizona* and under a correct understanding of *Hurst v. Florida*, this satisfied the requirement that a jury unanimously find a statutory aggravating circumstance beyond a reasonable doubt. *See Poole II*, 151 So. 3d at 419. In light of our decision to recede from *Hurst v. State* except to the extent it requires a jury unanimously to find the existence of a statutory aggravating circumstance, we reverse the portion of the trial court's order vacating Poole's death sentence. We

affirm the trial court's denial of Poole's guilt phase claim. And we remand to the trial court with instructions that Poole's sentence be reinstated and for proceedings consistent with this opinion.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LAWSON, J., concurs specially with an opinion.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I fully concur in the majority opinion and write separately to address the dissent's contentions: (1) that "national consensus," dissenting op. at 53, is relevant to our consideration of any legal issue decided today; (2) that today's decision "returns Florida to its status as an absolute outlier among the jurisdictions in this country that utilize the death penalty," *id.* at 51; (3) that "settled [Florida] law compelled this Court's conclusion in *Hurst v. State* [202 So. 3d 40 (Fla. 2016)] that the unanimity requirement applied not only to the jury's duty to determine whether to convict the defendant, but upon conviction, to the jury's duty to determine whether the defendant should receive the death penalty," dissenting op. at 53-54; and (4) that our decision "removes an important safeguard for ensuring that the death penalty is only applied to the most aggravated and least mitigated of murders," *id.* at 51-52.

- 40 -

I.      National consensus is irrelevant to our legal analysis.

It is axiomatic that we are bound by decisions of the United States Supreme Court when construing provisions of the United States Constitution. *Carnival Corp. v. Carlisle*, 953 So. 2d 461, 465 (Fla. 2007) ("[S]tate courts are bound by the decisions of the United States Supreme Court construing federal law." (quoting *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 220-21 (1931))). While political decisions by the various states are regularly considered in Eighth Amendment analysis to gauge "evolving standards of decency," *see, e.g.*, *Spaziano v. Florida*, 468 U.S. 447, 463-64 n. 9 (1984) (considering the statutory approaches of a number of jurisdictions to capital sentencing), *overruled in part by Hurst v. Florida*, 136 S. Ct. 616 (2016), a consideration when determining what constitutes cruel and unusual punishment, the Supreme Court has held that the Eighth Amendment does not require a jury determination on the ultimate question of whether to impose a death sentence. *Id.* at 465. In conducting its Eighth Amendment analysis of this issue in *Spaziano v. Florida*, the Supreme Court acknowledged that a significant majority of jurisdictions entrusted the sentencing decision to a jury in the death penalty context, *id*. at 463, making Florida one of only three jurisdictions that permitted a judge to impose a death sentence in the absence of a jury's unanimous determination that a death sentence should be

- 41 -

imposed.  *Id.*  Despite Florida's minority position, the Supreme Court found no

Eighth Amendment violation, reasoning:

> The fact that a majority of jurisdictions have adopted a different
> practice, however, does not establish that contemporary standards of
> decency are offended by the jury override.  The Eighth Amendment is
> not violated every time a State reaches a conclusion different from a
> majority of its sisters over how best to administer its criminal laws.
> "Although the judgments of legislatures, juries, and prosecutors weigh
> heavily in the balance, it is for us ultimately to judge whether the
> Eighth Amendment" is violated by a challenged practice.  *See*
> *Enmund v. Florida*, 458 U.S. 782, 797 (1982); *Coker v. Georgia*, 433
> U.S. 584, 597 (1977) (plurality opinion).  In light of the facts that the
> Sixth Amendment does not require jury sentencing, that the demands
> of fairness and reliability in capital cases do not require it, and that
> neither the nature of, nor the purpose behind, the death penalty
> requires jury sentencing, we cannot conclude that placing
> responsibility on the trial judge to impose the sentence in a capital
> case is unconstitutional.

*Id*. at 464.  Because the Supreme Court has already considered arguments based

upon "national consensus" in its analysis of this precise issue, *id*., and because we

are bound by this precedent, *Carlisle*, 953 So. 2d at 465, we cannot conduct an

original Eighth Amendment analysis, consider national consensus, and reach a

different result than that of the Supreme Court on this same legal issue.  *Id.*

Moreover, because the Supreme Court in *Spaziano* expressly held that the

Eighth Amendment does not require jury sentencing in capital cases, the Florida

Constitution expressly prohibits us from reaching a different result under the

Florida Constitution.  *See* art. I, § 17, Fla. Const. ("The prohibition against cruel or

unusual punishment, and the prohibition against cruel and unusual punishment,

- 42 -

shall be construed in conformity with decisions of the Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution.").

For these reasons, "national consensus" is irrelevant to *our analysis* of the legal issues presented in this appeal, and its consideration is therefore properly absent from the majority's legal analysis.

II.     Our decision today does not make Florida an "outlier."

The majority today decides constitutional questions, not political ones. Those constitutional questions are properly decided through legal reasoning, not policy analysis. It is true that Congress has made a policy decision requiring a unanimous jury recommendation before death can be imposed as a sentence under federal law. 18 U.S.C. § 3593(e) (2019). It is also true, as already discussed, that an overwhelming majority of states still authorizing death as a sentence have made the same legislative policy choice. *See Spaziano*, 468 U.S. at 463; *see also* Michael L. Radelet & G. Ben Cohen, *The Decline of the Judicial Override*, 15 Ann. Rev. L. & Soc. Sci. 539, 548-49 (2019). As for Florida law, today's decision does not alter section 921.141, Florida Statutes (2019), which still requires a unanimous jury recommendation before death can be imposed. If the Florida Legislature considers changing section 921.141 to eliminate the requirement for a unanimous jury recommendation before a sentence of death can be imposed, the

- 43 -

fact that this legislative change would make Florida an "outlier" will surely be considered in the ensuing political debate. As for the constitutional questions addressed in the majority opinion, our decision should be judged solely on the quality, clarity, and force of its legal analysis—not on speculation regarding possible future policy choices that are constitutionally entrusted to the political branch. *See* art. II, § 3, Fla. Const. ("The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.").

III.    Settled Florida law did not compel "this Court's conclusion in *Hurst v. State* that the unanimity requirement applied not only to the jury's duty to determine whether to convict the defendant, but upon conviction, to the jury's duty to determine whether the defendant should receive the death penalty."

Prior to this Court's decision in *Hurst v. State*, this Court had repeatedly and consistently held that Florida's constitution was not violated by imposition of a death sentence without unanimous jury determinations during the sentencing proceeding, *see* majority op. at 32, including in Poole's case. *Poole v. State*, 151 So. 3d 402, 419 (2014). This was the "settled [Florida] law" on the issue until *Hurst v. State*. The dissent's contrary claim, that "settled [Florida] law" compelled a contrary conclusion in *Hurst v. State*, is inaccurate. The "settled law" cited by the dissent is precedent existing "[f]or well more than a century . . . requir[ing] that

- 44 -

a jury unanimously vote to convict a defendant of a criminal offense." Dissenting op. at 53. If Florida's century-plus-old unanimous-verdict requirement so obviously and necessarily applied to capital sentencing proceedings that it compelled the conclusion reached for the first time in *Hurst v. State*, why was this argument soundly and repeatedly rejected by the entirety of Florida's judiciary until 2016, when *Hurst v. State* was decided?

Fundamentally, the dissent's argument, and the *Hurst v. State* holding, are premised on a mischaracterization of the jury's ultimate sentencing recommendation, and the penultimate considerations leading up to that recommendation under section 921.141, as factual determinations that constitute elements of the charged crime. This mischaracterization was neither grounded in reason nor supported by analysis. Rather, the *Hurst v. State* majority simply declared that the jury's sentencing determinations were "also elements [of the crime of capital murder] that must be found unanimously by the jury." 202 So. 3d at 54.

The erroneous declaration that the jury sentencing determinations were "elements" of the crime of capital murder—the sole basis stated for the *Hurst v. State* majority's conclusion that Florida's Constitution required jury unanimity on those determinations, *id.*—was initially corrected in *Foster v. State*, 258 So. 3d 1248, 1252 (Fla. 2018) (clarifying that "the *Hurst* [*v. State*] penalty phase findings

are not elements of the capital felony of first-degree murder"), an opinion joined

by four members of the original *Hurst v. State* majority. More recently, in *Rogers*

*v. State*, 44 Fla. L. Weekly S208 (Fla. Sept. 5, 2019), we explained:

> To the extent that in *Perry v. State*, 210 So. 3d 630, 633 (Fla. 2016), we suggested that *Hurst v. State* held that the sufficiency and weight of the aggravating factors and the final recommendation of death are elements that must be determined by the jury beyond a reasonable doubt, we mischaracterized *Hurst v. State*, which did not require that these determinations be made beyond a reasonable doubt. Since *Perry*, in *In re Standard Criminal Jury Instructions in Capital Cases* and *Foster*, we have implicitly receded from its mischaracterization of *Hurst v. State*. We now do so explicitly.

*Id.* at S212.

*Hurst v. State*'s implied characterization of the jury's capital sentencing

determinations as factual findings qualitatively indistinguishable from those made

by a jury when weighing evidence and rendering a guilt-phase verdict is also

incorrect. In reality, the recommendation is an individualized, conscience-based

exercise of discretion. This should be obvious when considering that a juror could

judge a crime to be highly aggravated and hardly mitigated but still recommend a

life sentence based upon some consideration personal to that individual juror. It

should also be obvious from the post-*Hurst v. State* penalty-phase jury instructions

authorized by this Court, which explain that "different [sentencing] factors or

circumstances may be given different weight or values by different jurors"; that

"each individual juror must decide what weight is to be given to a particular factor

- 46 -

or circumstance"; and that "[r]egardless of the results of each juror's individual weighing process—even if [a juror] find[s] that the sufficient aggravators outweigh the mitigators—the law neither compels nor requires [that juror] to determine that the defendant should be sentenced to death." *In re Standard Criminal Jury Instructions in Capital Cases*, 244 So. 3d 172, 191 (Fla. 2018).

While the penultimate "weighing" questions are phrased as fact-like determinations (and are certainly more fact-like than the recommendation), they are clearly designed as an analytical tool to guide individual jurors in making their individual recommendations—not as facts to be determined by the jury as a whole. Again, this is obvious from the instructions themselves, which do not even require mitigation findings and tell jurors that the weight given to all factors, as well as whether a fact is considered mitigating at all, are individual determinations.

Because the ultimate jury recommendation and penultimate weighing questions are neither "facts" historically entrusted to jurors under the Florida Constitution, nor "elements" of a crime, *Foster*, 258 So. 3d at 1252, the *Hurst v. State* majority demonstratively erred in stating that article I, section 22 of the Florida Constitution supports or compels jury unanimity on anything other than the existence of an aggravating circumstance. Settled Florida law was to the contrary.

IV.    Today's decision does not eliminate a safeguard needed to ensure that the death penalty is only applied to the most aggravated and least mitigated of murders.

- 47 -

The Eighth Amendment's protection against cruel and unusual punishment requires safeguards to assure that a death sentence is not imposed unless careful consideration is first given to the "particular acts by which the crime was committed . . . [and] the character and propensities of the offender," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (quoting *Pennsylvania ex.rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)), to appropriately narrow the class of cases in which the sentence can be imposed. *Id*. The procedures set forth in section 921.141 were enacted to comply with the Eighth Amendment in this regard by requiring the State to prove at least one statutorily defined "aggravating circumstance" before the death penalty can be considered, § 921.141(2)(b)1., (6), and by providing for the comprehensive consideration of mitigating circumstances. § 921.141(2)(b)2., (3)(a)2., (3)(b), (7). Additionally, before a death sentence can be imposed, the sentencing judge must enter a written order reflecting findings that "there are sufficient aggravating factors to warrant the death penalty . . . [and that] the aggravating factors outweigh the mitigating circumstances reasonably established by the evidence." § 921.141(4). Appellate review assures that these standards are met in every case. § 921.141(5) ("The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida and disposition rendered within 2 years after the filing of a notice of appeal. Such review by the Supreme Court shall have priority over all other cases and shall be

heard in accordance with rules adopted by the Supreme Court."); *see also Pulley v. Harris*, 465 U.S. 37, 45-46 (1984) (discussing the importance of "meaningful appellate review" in this context). Reviewing Florida's death penalty procedure, the Supreme Court has determined that a unanimous jury sentencing recommendation is not required to comply with the Eighth Amendment's demand that discretion to impose the death penalty be appropriately directed and limited. *Spaziano*, 468 U.S. at 464 ("[T]he demands of fairness and reliability in capital cases do not require [jury sentencing]."). Review of this Court's 2014 opinion affirming Poole's sentence of death illustrates why Florida's system meets Eighth Amendment demands of "fairness and reliability" without requiring a unanimous jury recommendation.

Loretta White and Noah Scott had gone to bed together in their mobile home. *Poole*, 151 So. 3d at 406. White was startled awake to find a stranger, Poole, attempting to rape her. *Id.* Scott repeatedly tried to stop the rape and, each time, Poole hit Scott in the face with a tire iron—beating Scott to death. *Id.* Poole ignored White's cries for mercy, which were emphasized by the plea that she was pregnant; he also beat her with the tire iron, severing some of her fingers as she tried to defend herself against the attack. *Id.* After raping, beating, and sexually assaulting White, Poole left her unconscious in the trailer. *Id.*

This murder was obviously highly aggravated by Poole's contemporaneous crimes. The trial judge appropriately found that these aggravators were sufficient to warrant the death penalty under Florida law and that the aggravators outweighed all mitigation so that a death sentence was appropriate. *Id.* at 419 (concluding that the trial court "properly" weighed "the aggravators against the mitigators" and affirming Poole's sentence of death). Even with the jury's 11-1 death recommendation, this Court appropriately and without hesitation (or dissent on this issue) determined that Florida's sentencing procedure had reliably guided and limited the sentencing decision in this case, as required by the Eighth Amendment. *Id*.

## Conclusion

The constitutionality of Poole's sentence was already decided by this Court in 2014. *Id. Hurst v. State* required the trial court to reevaluate the constitutionality of Poole's death sentence—and deciding this appeal required this Court to address the State's argument that *Hurst v. State* was incorrectly decided. For the reasons explained in the majority opinion, and above, it is clear that Poole suffered no constitutional deprivation in the imposition of his sentence and that we cannot reach a correct legal result in this appeal without receding in part from *Hurst v. State*. I fully agree with the majority's determination that we should partially recede from *Hurst v. State* because the State and those whose interests are

represented by the State in this case, including the victims and their families, relied heavily on the significant body of precedent upholding as constitutional the relevant statutory procedures invalidated in *Hurst v. State*, *cf. Johnson v. State*, 904 So. 2d 400, 410 (Fla. 2005) (explaining that "Florida's reliance on its capital sentencing has been entirely in good faith" in light of the legal precedent upholding its constitutionality); because the State and society's interests in the finality of Poole's sentence are equally strong, *see In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1367 (Fed. Cir. 2012) (Newman, J., dissenting) ("Finality is fundamental to the Rule of Law." (citing *S. Pac. R.R. v. United States*, 168 U.S. 1, 18 (1897))); and, because Poole's reliance interest on the erroneous *Hurst v. State* precedent is nonexistent. Majority op. at 38.

LABARGA, J., dissenting.

Today, a majority of this Court recedes from the requirement that Florida juries unanimously recommend that a defendant be sentenced to death. In doing so, the majority returns Florida to its status as an absolute outlier among the jurisdictions in this country that utilize the death penalty. The majority gives the green light to return to a practice that is not only inconsistent with laws of all but one of the twenty-nine states that retain the death penalty, but inconsistent with the law governing the federal death penalty. Further, the majority removes an important safeguard for ensuring that the death penalty is only applied to the most

aggravated and least mitigated of murders.  In the strongest possible terms, I dissent.

The requirement that a jury unanimously recommend a sentence of death comports with the overwhelming majority of states that have the death penalty.  At the time that *Hurst v. Florida* was decided, of the thirty-one states that legalized the capital punishment, only three states—Florida, Alabama, and Delaware—did not require that a unanimous jury recommend the death penalty.  Since that time, the Delaware Supreme Court declared the state's capital sentencing statute unconstitutional, *see Rauf v. Delaware*, 145 A.3d 430 (Del. 2016), and we held in *Hurst v. State* that unanimity was required in Florida.  These developments left Alabama as the sole death penalty state not requiring unanimity—until today.

Not only does requiring a unanimous recommendation of a sentence of death comport with the overwhelming majority of death penalty states, it also comports with federal law governing the imposition of the federal death penalty.  Title 18 U.S.C. § 3593(e) (2012) provides that after weighing the aggravating and mitigating factors and determining that a sentence of death is justified, "the jury *by unanimous vote,* or if there is no jury, the court, *shall recommend whether the defendant should be sentenced to death*, to life imprisonment without possibility of release or some other lesser sentence."  (Emphasis added.)  As we explained in *Hurst v. State*:

> The vast majority of capital sentencing laws enacted in this country provide the clearest and most reliable evidence that contemporary values demand a defendant not be put to death except upon the unanimous consent of the jurors who have deliberated upon all the evidence of aggravating factors and mitigating circumstances. By requiring unanimity in a recommendation of death in order for death to be considered and imposed, Florida will achieve the important goal of bringing its capital sentencing laws into harmony with the direction of society reflected in all these states and with federal law.

202 So. 3d at 61. By receding from the unanimity requirement, we retreat from the national consensus and take a huge step backward in Florida's death penalty jurisprudence.

The historical treatment of unanimity in Florida underscores our conclusion in *Hurst v. State* that Florida's right to trial by jury, contained in article I, section 22, of the Florida Constitution, requires that a jury unanimously recommend a sentence of death. For well more than a century, Florida law has required that a jury unanimously vote to convict a defendant of a criminal offense. *See Ayers v. State*, 57 So. 349, 350 (Fla. 1911) ("Of course, a verdict must be concurred in by the unanimous vote of the entire jury . . . ."); *On Motion to Call Circuit Judge to Bench*, 8 Fla. 459, 482 (Fla. 1859) ("The common law wisely requires the verdict of a petit jury to be unanimous . . . ."). This settled law compelled this Court's conclusion in *Hurst v. State* that the unanimity requirement applied not only to the jury's duty to determine whether to convict the defendant, but upon conviction, to the jury's duty to determine whether the defendant should receive the death

penalty. We said: "This recommendation is tantamount to the jury's verdict in the sentencing phase of trial; and historically, and under explicit Florida law, jury verdicts are required to be unanimous." *Hurst*, 202 So. 2d at 54. Given Florida's long history of requiring unanimous jury verdicts, it defies reason to require unanimous juries for the conviction of a capital offense but to then reduce the jury's collective obligation when determining whether the defendant's life should be taken as punishment for that offense.

As Justice Brennan explained: "[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1977). Our determination that Florida's right to trial by jury requires unanimity fell squarely within our role as "the arbiters of the meaning and extent of the safeguards provided under Florida's Constitution." *Busby v. State*, 894 So. 2d 88, 102 (Fla. 2004). "[W]e have the duty to *independently* examine and determine questions of state law so long as we do not run afoul of federal

constitutional protections or the provisions of the Florida Constitution that require us to apply federal law in state-law contexts." *State v. Kelly*, 999 So. 2d 1029, 1043 (Fla. 2008).

In deciding *Hurst v. State*, this Court was ever mindful that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972)). Requiring "that a jury must unanimously recommend death in order to make a death sentence possible serves that narrowing function required by the Eighth Amendment . . . and expresses the values of the community as they currently relate to imposition of death as a penalty." *Hurst*, 202 So. 3d at 60.

The imperative for a just application of the death penalty is not a pie-in-the-sky concept. "The unusual severity of death is manifested most clearly in its finality and enormity. Death, in these respects, is in a class by itself." *Furman*, 408 U.S. at 289 (Brennan, J., concurring). Florida holds the shameful national title as the state with the most death row exonerations. Since 1973, twenty-nine death row inmates have been exonerated, and those exonerations have continued to this very year. Death Penalty Information Center, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/florida (last visited December 23, 2019). Given this

history, there is every reason to maintain reasonable safeguards for ensuring that the death penalty is fairly administered.

I strongly object to the characterization of this Court's decision in *Hurst v. State* as one where this Court "wrongly took [discretion] from the political branches." Majority op. at 39. As the court of last resort in Florida's third and co-equal branch of government—whose responsibility it is to interpret the law— that is what this Court did in *Hurst v. State*. The constitutionality of a provision of Florida's death penalty law is uniquely this Court's to interpret.

Death is indeed different. When the government metes out the ultimate sanction, it must do so narrowly and in response to the most aggravated and least mitigated of murders. Florida's former bare majority requirement permitted a jury, with little more than a preponderance of the jurors, to recommend that a person be put to death. This Court correctly decided that in Florida, the state and federal constitutions require much more and, until today, for a "brief and shining moment," it did just that.[6]

Sadly, this Court has retreated from the overwhelming majority of jurisdictions in the United States that require a unanimous jury recommendation of death. In so doing, this Court has taken a giant step backward and removed a

6. Alan J. Lerner & Frederick Loewe, *Camelot*, act II, scene 7 (1960).

significant safeguard for the just application of the death penalty in Florida.

Although in 2017, in response to our decision in *Hurst v. State*, the Legislature revised section 921.141(2), Florida Statutes, to require a unanimous recommendation by the jury, nothing in the majority's decision today requires the Legislature to abandon the unanimity requirement. As the majority pointed out in its decision: "Our decision today is not a comment on the merits of those changes or on whether they should be retained." Majority op. at 39.

For these reasons, I dissent.

An Appeal from the Circuit Court in and for Polk County,
Jalal A. Harb, Judge - Case No. 532001CF007078A0XXXX

Ashley Moody, Attorney General, Tallahassee, Florida, and Scott A. Browne, Chief Assistant Attorney General, Tampa, Florida,

for Appellant/Cross-Appellee

Eric Pinkard, Capital Collateral Regional Counsel, and James L. Driscoll Jr., David Dixon Hendry, and Rachel P. Roebuck, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida; and Mark J. MacDougall and Z.W. Julius Chen, Washington, District of Columbia, and Parvin Daphne Moyne of Akin Gump Strauss Hauer & Feld LLP, New York, New York,

for Appellee/Cross-Appellant